LOVELL ENTERPRISES, INC., Plaintiff-Appellee, *v.* CAMPBELL-BURNS WOOD PRODUCTS, INC., and HAWAIIAN TIMBER PRODUCTS, INC., Defendants-Appellants

NO. 7539

(CIVIL NO. 4796)

DECEMBER 2, 1982

BURNS, C.J., HEEN AND TANAKA, JJ.

532

OPINION OF THE COURT BY HEEN, J.

Defendants-appellants Campbell-Burns Wood Products, Inc. (Campbell) and Hawaiian Timber Products, Inc. (Hawaiian), both Hawaii corporations,[1] appeal from a money judgment entered below on June 12, 1979, and a subsequent order denying their motion for judgment notwithstanding the verdict or in the alternative for new trial, entered on July 13, 1979. We affirm.

On or about September 9, 1976, plaintiff Lovell Enterprises, Inc. (Lovell) entered into a contract with Campbell under which Lovell was to cut and deliver to Campbell's mill in Hilo 1,500,000 board feet

---

[1] Plaintiff alleged in its complaint that Hawaiian was the agent of or transacted business on behalf of Campbell. Although the answer denied that allegation, the matter is not in serious dispute. The legal relationship between the defendants is not clear from the record; however, the majority stock in both companies was apparently owned by one person. Defendants were and are represented by the same counsel, and the verdict form and judgment are joint. Defendants made no attempts to sever themselves at trial and have jointly appealed.

of Eucalyptus Robusta logs. Work began under the contract, and on February 4, 1977, the contract was modified to increase the amount of logs to 3,000,000 board feet. Campbell was to pay $60.00 per thousand board feet. Lovell was to furnish all equipment and haul all the logs to Campbell's mill. The contract was to be completed within calendar year 1977.[2]

On March 18, 1977, Lovell obtained a bank loan of $25,000 (T. I, p. 58) and assigned the contract proceeds to the Bank of Hawaii. (Ex. 11) In addition, Lovell made arrangements with one John Wilson (Wilson) of Oregon to have made available sufficient men and equipment to complete the contract on time. (T. II, pp. 105-114) On or about April 13, 1977, Hawaiian informed Lovell that it planned to increase the harvest to 5,500,000 board feet.[3] (Ex. 11) However, on May 14, 1977, Hawaiian declared a three-week "moratorium" on the logging and requested Lovell to cease felling trees and to clean up the logging areas. (Ex. 13) At that time, Lovell had logged 630,470 board feet, leaving a total of 2,369,530 remaining to be logged under the contract. (Opening Brief at vA.) On that same date, Hawaiian wrote to the state forester informing him that the "moratorium" was being established because Hawaiian's logging and milling operation was economically unsound. (Ex. 14) On May 24, 1977, Lovell informed Hawaiian that it would go along with the moratorium. However, the situation was difficult for Lovell because it had made commitments for the bank loan and for additional men and equipment because of the contract. (Ex. 15) On June 6, 1977, Lovell's attorney wrote to Hawaiian asking assurance that logging would continue under the contract. (Ex. 18) Hawaiian did not respond and suit was filed on July 7, 1977.

At trial, the parties stipulated that under the contract Lovell was

---

[2] The contract originally provided also for Lovell to construct necessary roads within the forest area; however, the road construction was made the subject of further negotiations and, at trial, the court granted defendants' motion for directed verdict at the close of evidence and ruled there was no contract for the road construction. This is not an issue on appeal.

[3] Prior to this date, all communications were between Lovell and Campbell. Active management of both companies was taken over by the author of the letter in April 1977. (Tr. IV, p. 614) Thereafter, correspondence to plaintiff was from Hawaiian.

entitled and obligated to log 3,000,000 board feet less the amount logged before the anticipatory breach; that both parties had duly performed the contract until defendants' anticipatory breach; and that defendants had anticipatorily breached the contract.

At the conclusion of Lovell's case, defendants moved to dismiss the claim for the reason that Lovell had not shown it could have completed the contract in 1977 and if it could, it would have done so at a loss. The motion was denied.

After the close of all the evidence, defendants moved for directed verdicts relating to Lovell's instruction number 16 and to Lovell's assertion in instruction number 17 that it was entitled to recover, as damages, its expenses incurred in attempting to mitigate damages. The first motion was denied, and the court stated it would "take care" of the latter motion in the instructions. Defendants' verdict form was adopted by the court, and on April 5, 1979, the jury returned its verdict for plaintiff in the amount of $55,000.

On April 26, 1979, defendants filed a motion for judgment notwithstanding the verdict or for new trial. Both motions were denied on June 12, 1979.

Defendants contend that the court erred:

1. In allowing Lovell's president to testify as to his conversations with Wilson about obtaining additional men and equipment for the project;

2. In admitting into evidence economic projections prepared by Lovell's expert witness relating to the contract;

3. In denying defendants' motion for judgment notwithstanding the verdict; and

4. In denying defendants' motion for new trial.

We find no reversible error.

1.

Lovell's president testified that when the February 1977 agreement was signed, he and defendants' representatives discussed the fact that Lovell would need to obtain a loan and in turn purchase more equipment in order to perform the contract. (T., p. 57) Lovell borrowed $25,000 from the Bank of Hawaii, Hilo branch, in April 1977, and used the contract to assure repayment.

Defendants objected to any testimony by Lovell's president con-

cerning his talks with Wilson regarding Lovell's need for additional equipment and personnel as hearsay. The court sustained this objection. (T., p. 62) However, at the start of further proceedings the following day, the court reversed its ruling and allowed the testimony. (T., p. 104) Lovell's president then testified that Wilson told him he could make available to Lovell more fallers[4] and skidders[5] to complete the contract.

Defendants argue that the second ruling was erroneous and prejudicial because it allowed plaintiff to adduce inadmissible evidence to show that it could have completed the contract.

We agree that admission of the evidence was error. However, careful scrutiny of the entire record indicates defendants suffered no prejudice from the court's ruling. Rule 61, Hawaii Rules of Civil Procedure (HRCP) (1980). As stated earlier, Lovell's president testified that defendants knew at the time of the February 1977 contract that Lovell would need to obtain more money, men, and equipment. Other evidence of his efforts to obtain them was received without objection. Thus, there was evidence that, on or about March 18, 1977, Campbell acknowledged and accepted instructions to forward the proceeds under the contract to Bank of Hawaii in payment of a loan of funds. (Ex. 11) Lovell's president testified that he told Frank Weskamp, Campbell's manager at the time, that he would be able to get equipment for the project. Also, on May 24, Lovell wrote to Hawaiian and told them he had a commitment for a bank loan and for men and equipment to be brought from Oregon. (Ex. 15) Defendants have suffered no substantial injustice. HRCP, Rule 61, *supra. Cf. Kekua v. Kaiser Foundation Hospital,* 61 Haw. 208, 218, 601 P.2d 364, 371 (1979).

2.

Defendants contend that the court erred in allowing into evidence economic projections of expected profits prepared by Lovell's accountant, Joe Yamauchi (Yamauchi).

Yamauchi was qualified without objection and testified that he

---

[4] Lumber personnel who fell trees.

[5] Equipment used to move cut logs along the ground.

prepared projections of income and expenses under the contract from data given him by Lovell. Defendants were allowed extensive voir dire on the accountant's projections, amounting literally to cross-examination.

Yamauchi prepared and testified to a number of projections, but defendants raise error only as to exhibits 53, 54, and 31.[6] Exhibit 53 showed projected income and expenses for the period from September 9, 1976 to December 31, 1977. This exhibit showed a gross profit[7] from the contract of $56,608.78, and a net profit[8] of $26,806.77. In calculating the expenses for this period, Yamauchi computed the average of the actual monthly expenses over the ten months from September 9, 1976 to June 30, 1977, and projected these same average monthly expenses over the next six months. Defendants objected that the exhibit was misleading because it did not show that in order to increase the production to meet the contract, Lovell would have to add staff and equipment. Defendants also argued that Lovell's expenses would have been higher and Lovell would not have any profit. Defendants' objection was overruled.

Exhibit 54 was Yamauchi's projected income and expenses for the six-month period from June 30, 1977 to December 31, 1977. This projection showed a gross profit of $78,022.63, and a net profit of $57,885.55. Again, the expenses were determined by calculating the average over the first ten months and projecting that average over the six-month period. Defendants made the same objection, and were overruled. When asked on cross-examination how Lovell could show a profit in this six-month period, when it showed a loss over the previous ten months, Yamauchi testified that the increased production in this period would bring in greater income. He also testified that if the contract could have been completed in less than

---

[6] Plaintiff was also allowed to enter into evidence through Yamauchi "blow-ups" of these exhibits. These were numbered 62 and 63 to match exhibits 53 and 54, while portions of exhibit 31 were shown on exhibits 58 and 59. These "blow-ups" are also covered by defendants' objections.

[7] Yamauchi defined gross profit as the difference between gross income from the contract and expenses directly necessary to performance of the contract.

[8] Net profit was defined as the gross profit less overhead and expenses not directly attributable to performance of the contract.

the period agreed to, there would be a monthly saving in expenses of $10,000.

Yamauchi testified he was not told to reflect in his projections any increase in expenses resulting from additional manpower and equipment and personnel until just before trial when he prepared the revised figures shown on exhibits 31, 58 and 59. Exhibit 31 was a basic work sheet showing the data used by Yamauchi and contained a revised estimate of income and expenses for the period from June 1, 1977 to December 31, 1977.[9] This revision showed increased expenses for the additional men and equipment and deletion of profits from the road work. The revised figures for logging are reflected in exhibit 58 and show gross profit of $60,027.20, and net profit of $37,360.44.

Defendants contend that the exhibits should not have been received into evidence because they were delusive and did not have more than a minimum of probative value. Because Yamauchi projected that the expenses for the period from the breach to the terminal date of the contract would remain the same as for the period prior to the breach, the expenses were delusively low. The exhibits did not indicate that more equipment and men would have to be taken on and that expenses would rise. Therefore, the profits shown were too high. In fact, defendants argue, Lovell would have suffered a loss except for the termination.

The general rule relating to expert testimony is that the competency of the expert to testify on the matter at issue is a decision for the trial court. The extent of his knowledge of the subject and, therefore, the accuracy of his conclusion thereon is a question of weight rather than disability. *See Territory v. Adelmeyer,* 45 Haw. 144, 148, 363 P.2d 979, 983 (1961). Once an expert has been qualified, the weight and credibility of his evidence within the scope of his expertise is for the jury to decide. *Cafarella v. Char,* 1 Haw. App. 142, 145, 615 P.2d 763, 766 (1980). It is the jury's function to determine the credibility of the evidence even though it may be arguably

---

[9] The revision was made shortly before trial. The beginning date was used on the theory that the anticipatory breach occurred in May 1977. Defendants do not question the earlier date.

contradictory or unreasonable, unless the witness' testimony is either inherently improbable or incredible. *State v. Bogdanoff,* 59 Haw. 603, 608, 585 P.2d 602, 606 (1978).

Yamauchi was qualified as an expert witness without objection. On cross-examination, he supported his use of the average expenses over the first ten months of the contract. He stated that Lovell's records indicated that in one of the previous months of operation, enough lumber was logged to enable it to meet the contract requirements, if the same amount could be logged over the remaining months. Also, he believed that even with existing staff and equipment, the contract could be met if all employees worked to full capacity.

Yamauchi's testimony was contradictory to other evidence. The testimony of Lovell's president, Weskamp, and Libert Landgraf, chief state forester, all indicated that Lovell could complete the contract only with the additional men and equipment. However, Yamauchi's figures themselves were not inherently confusing or misleading. It was properly left to the jury to decide whether or what parts of his testimony were credible and worthy of belief. Certainly exhibit 31 overcame defendants' argument that it was "fundamentally inaccurate" because it in fact included in its revised figures the increased expenses caused by the added staff and equipment.

3.

At the close of the evidence, defendants made two "motions for directed verdict."

In the first motion, defendants asked the court to refuse to give Lovell's instruction number 16.[10] The motion was denied. (T., p. 1133) In the second motion, defendants asked for a directed verdict on the question of Lovell's recovery of expenses incurred in mitiga-

---

[10] PLAINTIFF'S
JURY INSTRUCTION NO. 16

You are instructed that where it is proven that the Plaintiff suffered a net loss of profits on the contract that the Plaintiff is still entitled to recover the fair value, not in excess of the total contract price of the work done and materials furnished prior to Defendants' breach of contract.

tion of damages, and related to Lovell's instruction number 17.[11] The court did not rule on this motion, but stated it would take care of the matter in the instructions. (T., p. 1133)

Notwithstanding its earlier ruling regarding Lovell's instruction number 16, the court in fact refused both of plaintiff's instructions. Defendants acknowledge that the "trial court found for [Defendants] by refusing to give the two jury instructions." (O.B., p. 23)

After the verdict was returned, defendants filed a motion for judgment n.o.v. pursuant to Rule 50(b), HRCP (1972, as amended). The motion attacked the verdict as not being supported by substantial evidence. The motion was denied.

Realizing that, under Rule 50(b), HRCP, a motion for judgment n.o.v. must have been preceded by a motion for directed verdict made at the close of evidence and before the jury retires, defendants argue that their motions attacking Lovell's instructions were sufficient prerequisite for their motion for judgment n.o.v. Lovell argues that defendants' motions at the end of trial were really objections to instructions and not motions for directed verdict. As such, Lovell argues, they do not entitle defendants to a motion for judgment n.o.v. *Pooler v. Stewarts' Pharmacies, Ltd.,* 42 Haw. 618 (1958). We interpret the motions as being for directed verdict and hold, nonetheless, that the motion for judgment n.o.v. was without the requisite foundation.

First, Rule 50(b), HRCP states that when a motion for directed verdict made at the close of all the evidence is *denied,* the court is deemed to have submitted the action to the jury, subject to a later determination of the legal questions raised by the motion. After verdict, the movant may then move to have the verdict and judgment set aside and have judgment entered in accordance with his motion for directed verdict. Because defendants' motions were

---

[11]  PLAINTIFF'S
JURY INSTRUCTION NO. 17

You are instructed that damages are recoverable for losses incurred in a reasonable effort, whether successful or not, to avoid harm that the Defendant had reason to foresee as a probable result of his breach when the contract was made.

granted, they could not, under the rule, move for judgment n.o.v.

Further, a motion for judgment n.o.v. is technically a renewal of the motion for directed verdict made at the close of the evidence and cannot assert a ground that was not included in the motion for directed verdict. 9 WRIGHT AND MILLER, FEDERAL PRACTICE AND PROCEDURE: *Civil* § 2537, p. 598 (1971). Defendants' motion for judgment n.o.v. cannot meet this requirement.

Defendants argue, however, that motions for directed verdict made at the close of evidence should be viewed liberally and their motions made at the close of evidence should be considered with their earlier motion at the close of plaintiff's evidence to provide the requisite specificity. However, that rule of considering the two motions together is only applied where the later motion lacks specificity. 5A MOORE'S FEDERAL PRACTICE AND PROCEDURE, ¶ 50.04 (2d ed. 1982). This rule is not applicable here. Their motions at the close of evidence clearly stated the grounds and met the specificity requirement. There is no need to resort to the earlier motion to determine specificity. *Cf. Pooler v. Stewarts' Pharmacies, Ltd., supra,* at 620.

Defendants cite *Dawson v. McWilliams,* 146 F.2d 38, 40 (5th Cir. 1944), in support of their argument. In *Dawson,* however, defendant's first motion was on the ground that the evidence "does not establish facts sufficient to create the cause of action in favor of the plaintiff. . . or to sustain a verdict in favor of the plaintiff. . . ." At the end of the case, defendant moved the court peremptorily to instruct the jury to return a verdict in favor of defendants. *Id.* at 40. The court considered the motions together in order to provide the specificity that was lacking in the second motion. The case at bar presents the reverse situation. *Cf. Pooler v. Stewarts' Pharmacies, Ltd., supra,* at 620.

4.

Defendants' motion for judgment n.o.v. was joined with an alternative motion for new trial on the ground that the verdict was against the weight of the evidence. HRCP, Rule 50(b).

Defendants argue that the evidence adduced by Lovell was insufficient to support the jury's verdict. They contend that the evidence manifestly weighs against a finding that Lovell could have completed the contract within the period prescribed and that the jury

award was excessive. Therefore, the court should have granted their motion for new trial.

Our review of the record indicates that there was sufficient evidence to support the jury's verdict in both respects.

Generally, the granting or denying of a motion for a new trial is within the trial court's discretion. *Struzik v. City and County of Honolulu*, 50 Haw. 241, 437 P.2d 880 (1968). On appeal, unless the appellant shows an error of law or a clear abuse of discretion by the trial court, its ruling will not be disturbed. *Stahl v. Balsara*, 60 Haw. 144, 587 P.2d 1210 (1978); *Harkins v. Ikeda*, 57 Haw. 378, 557 P.2d 788 (1976). Where, however, the only ground for the motion is that the verdict is against the weight of the evidence, the trial court no longer possess unbridled discretion in the disposition of the motion. Where the verdict is supported by no more than a scintilla of evidence, the trial court has the discretion to grant a new trial or judgment n.o.v. as the circumstances warrant.[12] *Robinson v. Honolulu Rapid Transit & Land Co.*, 20 Haw. 426 (1911). However, where there is substantial evidence, more than a mere scintilla, to support the jury's verdict, the trial court should not grant the motion for new trial. *Solomon v. Niulii Mill & Plantation Ltd.*, 32 Haw. 865 (1933). On appeal, the appellate court will review the record below and if there is substantial evidence, more than a scintilla, to support the verdict returned by the jury, the reviewing court will not upset the denial of a motion for new trial. *Lyon v. Bush*, 49 Haw. 116, 412 P.2d 662 (1966).

### A.

The evidence was sufficient to support a finding that Lovell could have completed the contract on time.

The evidence shows that at the time of the February 1977 contract, the parties were aware that Lovell would need more capital, men, and equipment to perform its part of the bargain. The evidence is undisputed that Lovell obtained a bank loan and that

---

[12] We note that the rule in the federal courts is different, the trial judge having a wider range of discretion. *See* 11 Wright & Miller, *supra*, §§ 2806 and 2819, and 6A Moore's, *supra*, ¶ 59.08[5].

defendants were aware of this in March of 1977. Obviously, the money was to be used to obtain equipment and as operating capital.

Lovell's president testified that he had a commitment for men and equipment to be made available and, thus, would be able to complete the contract.

In addition to Lovell's president, two independent witnesses, Libert Landgraf and Frank Weskamp, testified that with the additional men and equipment that Lovell's president testified would be made available, Lovell could easily have completed the contract on time. Both witnesses were familiar with Lovell's operation. Landgraf was the chief state forester who had supervision of defendants' timber license. Weskamp was resident manager of Campbell at the time of the contract and had supervision of its logging activities and the contract. He also testified Lovell was above average in efficiency.

Defendants' witnesses did not directly contradict Lovell's evidence. Defendants' witnesses were Glenn Mueller, who became general manager of Hawaiian in April 1977; Nelson Kunitake, state forester directly responsible under Landgraf for supervision of the timber license; Ned Hogan, a graduate forester hired by Hawaiian at the time of the moratorium to help oversee Lovell's "clean-up" operation; and John Marrack, CPA.

Kunitake testified that Lovell could not have completed the contract with the complement of men and equipment he had at the time of the breach, but would have to obtain more. He could not say whether the contract could have been performed with the expanded work force and equipment.

Hogan, on the other hand, testified that Lovell could complete the contract with the additional men and equipment. However, he stated that Lovell's operation was inefficient and would require careful supervision.

Mueller and Marrack did not directly observe Lovell's operation but testified that its inadequate business records indicated a high degree of inefficiency.

### B.

The considerations governing this court's power to review a jury's award of damages on a claim of excessiveness is set forth in

*Vasconcellos v. Juarez*, 37 Haw. 364 (1946).

The power of this court to disturb a verdict on the ground of excessive damages is one which should be exercised with great caution and discretion, the duty of guarding against excessive verdicts necessarily resting to a large extent with the trial judge and a reviewing court giving great weight to the trial judge's approval of the verdict.

\* \* \* \* \*

Controlling the question of excessive damages is the general rule of law, well settled in this jurisdiction, that a finding of an amount of damages is so much within the exclusive province of the jury that it will not be disturbed on appellate review unless palpably not supported by the evidence, or so excessive and outrageous when considered with the circumstances of the case as to demonstrate that the jury in assessing damages acted against rules of law or suffered their passions or prejudices to mislead them. *(Ward v. I.I.S.N. Co.,* 22 Haw. 488; *Tsuruoka v. Lukens,* 32 Haw. 263.)

*Id.* at 365-366.

Defendants argue that the verdict of $55,000 was against the manifest weight of the evidence. As stated above, that is not the issue created by defendants' motion. Moreover, we disagree.

Lovell's evidence on damages came from the testimony of its president, Weskamp, and Yamauchi. Lovell's president testified that when he applied for the bank loan of $25,000, he was required to submit a projection of profits on the contract. That projection indicated a profit of $35,566, and was based on Lovell's obtaining more men and equipment. In fact, that was the purpose of the loan. Weskamp testified that when he was manager of Campbell, he had projected the income and expenses under the contract and estimated that Lovell could have realized a maximum gross profit of $80,000 and a minimum of $60,000 if they experienced problems with rain. He was aware that Lovell planned to obtain more men and equipment and, the extended contract was entered into in order to assist Lovell in obtaining the bank loan. The computations for Lovell's president's and Weskamp's projections were not available. We have already noted that Yamauchi's projection of gross profit using the additional men and equipment was $60,027.20.

On the other hand, defendants' evidence through Mueller and Marrack, indicated that Lovell, even if it could complete the contract, would have lost from $33,700 to $60,700.

Defendants do not contest the court's instructions that the measure of damages was the gross profits Lovell would have earned from the contract. The evidence of gross profits ranged from a low of $35,566 (Lovell's president) to a high of $60,027.20 (Yamauchi's). The breach being admitted, and the jury having determined Lovell's ability to complete the contract, it was not bound to accept defendants' estimates and projections of losses. The jury had available to it the figures upon which Marrack and Yamauchi arrived at their projections. They were thus provided with the means of determining, with the requisite legal exactitude, the damages suffered by Lovell as a result of defendants' admitted breach. We note that the award is less than the highest estimate of damages, indicating that the jury did not merely accept Lovell's projections, but made its own calculations.

We cannot say that the jury's award is palpably unsupported by the evidence. Considering the evidence and the circumstances of the case, this court cannot say that the jury acted against the rules of law or suffered their passions or prejudices to mislead them. We are, therefore, constrained to give great weight to the trial judge's approval of the verdict. *Vasconcellos v. Juarez, supra.*

Defendants argue that the jury could have included within its award the damages claimed by Lovell because it had to sell its equipment after the breach in order to pay its obligations. Unfortunately, the verdict form, which was submitted by defendants and adopted by the court, is a general one and does not lend itself to a breakdown of the award. It is as reasonable to say, in view of the circumstances, that the jury could have ignored that evidence and awarded damages only for the lost profits.

Affirmed.

*William J. Rosdil* for defendants-appellants.
*Stanley H. Roehrig* for plaintiff-appellee.