176 P.3d 91

**Kitty K. KAMAKA, Plaintiff–
Appellant/Cross–
Appellee,**

v.

**GOODSILL ANDERSON QUINN & STI-
FEL, a Law Corporation, Defendant–
Appellee/Cross–Appellant.**

No. 26308.

Supreme Court of Hawaiʻi.

Jan. 24, 2008.

As Corrected Jan. 25 and Feb. 14, 2008.

See also 108 Hawaiʻi 194, 118 P.3d 677.

Ke–Ching Ning, Jared N. Kawashima, Jeannie H. Jang, and Valerie M. Kato (of Ning, Lilly & Jones), on the briefs, Honolulu, for plaintiff-appellant/cross-appellee.

Wilma Sur (of Miller Tokuyama Kralik & Sur), on the briefs, Honolulu, for defendant-appellee/cross-appellant on the appeal and cross-appeal and David J. Dezzani, Lindalee K. (Cissy) Farm, Edmund K. Saffery, and Emily Reber Porter (of Goodsill Anderson Quinn & Stifel), on the briefs, Honolulu, for defendant-appellee/cross-appellant, Goodsill Anderson Quinn & Stifel, on the cross-appeal.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ.; Circuit Judge WONG, in Place of ACOBA, J., Recused.

Opinion of the Court by MOON, C.J.

Following a jury trial, plaintiff-appellant/cross-appellee Kitty Kamaka appeals— and defendant-appellee/cross-appellant Goodsill Anderson Quinn & Stifel (Goodsill) cross appeals—from the Circuit Court of the First Circuit's [1] December 24, 2003 final judgment

---

1. The Honorable Gail Nakatani originally presid- ed over this case until April 14, 2000, when,

entered in favor of Goodsill and against Kamaka in this wrongful termination case, as well as the December 24, 2003 order awarding attorneys' fees and costs in favor of Goodsill. Briefly stated, Kamaka had been employed by Goodsill, a Honolulu law firm, as an associate attorney, since October 1994. On February 21, 1996, Goodsill terminated Kamaka's employment because of alleged misconduct, for which she was also referred by Goodsill to the Office of Disciplinary Counsel (ODC), pursuant to Hawai'i Rules of Professional Conduct (HRPC) Rule 8.3(a) (1999).[2] Since December 1995 and up until the time of her termination, Kamaka was on a leave of absence from the firm due to pregnancy and childbirth.

Subsequent to her termination, Kamaka filed an amended ten-count complaint, asserting twelve claims for relief. Prior to trial, Goodsill successfully disposed of seven of Kamaka's claims via motions to dismiss or for summary judgment or partial summary judgment; during trial, two additional claims were dismissed by the trial court. Eventually, the three remaining claims—violation of civil rights (pregnancy discrimination), breach of implied contract based on Goodsill's employee manual, and intentional infliction of emotional distress (IIED)—were submitted to the jury. Ultimately, the jury found in favor of Kamaka solely on her claim for breach of implied contract and awarded her $209,937.91 in special damages.

Subsequent to trial, Goodsill renewed its motion for judgment as a matter of law on the implied contract claim, pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 50(b) (2000), quoted *infra*, which the trial court granted.[3] Consequently, the trial court

entered final judgment in favor of Goodsill as to all claims and entered an order granting Goodsill's motion for attorneys' fees and costs; Kamaka appealed.

On appeal, Kamaka contends, *inter alia*, that the circuit/trial court erred in: (1) excluding evidence of the ODC case; (2) granting certain of Goodsill's motions to dismiss and for summary judgment; (3) denying her motions to amend complaint; (4) granting Goodsill's renewed motion for judgment as a matter of law; and (5) granting Goodsill's motion for attorneys' fees and costs. Although Goodsill's position is that the final judgment in this case should be upheld in its entirety, Goodsill cross appeals in apparent recognition of the possibility that this court may not agree with its position. On cross-appeal, Goodsill contends that the trial court erred in a number of evidentiary rulings and in issuing erroneous and prejudicial jury instructions.

For the reasons discussed more fully *infra*, we affirm the trial court's December 24, 2003(1) final judgment and (2) order granting Goodsill's attorneys' fees and costs. In light of the aforementioned disposition, Goodsill's cross-appeal need not be addressed.

## I. BACKGROUND

### A. Factual Background

The following factual background is gleaned from the evidence adduced at trial, including the trial testimonies of: (1) Kamaka; (2) Barbara Petrus, a partner at Goodsill and Kamaka's supervisor; (3) Robert Hackman, a partner member of Goodsill's Associate De-

---

pursuant to a newly implemented trial calendaring system, the case was assigned to the Honorable Virginia Lea Crandall. For purposes of this opinion, pre-trial rulings made by Judge Nakatani are referred to as made by "the circuit court"; rulings made by Judge Crandall are referred to as made by "the trial court."

**2.** HRPC Rule 8.3(a) provides:

A lawyer having knowledge that another lawyer has committed a violation of the rules of professional conduct that raises a substantial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer in other

respects, shall inform the appropriate professional authority[, *i.e.*, the ODC].

**3.** At the close of Kamaka's case-in-chief and at the close of all of the evidence, Goodsill had moved for a "directed verdict" as to all claims, which the trial court denied. HRCP Rule 50 was amended, effective January 1, 2000, and renamed a motion for directed verdict as a "motion for judgment as a matter of law." *Hac v. Univ. of Hawai'i*, 102 Hawai'i 92, 98 n. 10, 73 P.3d 46, 52 n. 10 (2003). Likewise, a motion for judgment notwithstanding the verdict is now referred to as a "renewed motion for judgment as a matter of law." HRCP Rule 50(c).

velopment Committee (ADC);[4] and (4) David Reber, a partner member of Goodsill's Management Committee.[5]

Kamaka began her employment with Goodsill on October 3, 1994, after leaving another Honolulu law firm. According to Kamaka, she left her former firm because she thought the move to Goodsill would be good for her career. At the time she joined Goodsill, Kamaka had been practicing for approximately five years, primarily in the area of employment law.

Kamaka became pregnant in early 1995. At trial, Petrus testified that, by May 1995, she began to question Kamaka's honesty based upon her observations of Kamaka's work. At about that time, Kamaka failed to timely prepare certain legal documents to meet an upcoming deadline prior to taking leave from work to attend a conference. In order to meet the deadline, Petrus and other associates stepped in and generated the required documents. In so doing, Petrus discovered that Kamaka had not completed work that she had previously claimed to have done. As a result, Petrus testified that she began "pulling cases away from" Kamaka, which cases were then assigned to other associates. As the newly assigned associates familiarized themselves with these cases, additional discrepancies were discovered and reported to Petrus. Eventually, on September 12, 1995, Petrus prepared Kamaka's written evaluation wherein she stated that Kamaka had regularly made entries on billing time sheets for work not done and should be immediately terminated.

Kamaka testified that Petrus had developed an antagonism toward her. According to Kamaka, her pregnancy announcement on August 3, 1995 was the event that marked a deterioration in her employee-supervisor relationship with Petrus. On October 5, 1995, Kamaka received a negative annual review from the ADC, specifying Petrus' concerns about Kamaka's billing practices. On November 20, 1995, Goodsill, expressing further concern about Kamaka's billing practices, placed her on probation pending further review of the matter. In the probation letter, dated November 20, 1995, Goodsill stated that:

> [Kamaka's] performance to date has been unacceptable. Therefore, you will be on probation for a period of six months beginning today. Your supervising partner will be Larry Song. [6] If there are any continued deficiencies in the areas listed below, [7] ] or in any other areas identified to you by Larry Song, you will be subject to immediate termination.

By December 19, 1995, Goodsill's Management Committee had concluded that Kamaka had falsified her time records and should be terminated. However, based on the recommendation of the ADC, the Management Committee decided to delay Kamaka's termination until after Kamaka gave birth in order to minimize stress on Kamaka and her unborn child. Kamaka's last day at work before commencing her family leave was December 29, 1995. Kamaka gave birth on January 3, 1996. On February 21, 1996,

---

4. The ADC, among other things, conducts annual reviews on each associate based on written evaluations submitted by some or all of the partners and the associate's supervisor. The ADC also makes recommendations to Goodsill's Management Committee, where appropriate. *See infra* note 5.

5. The Management Committee is the administrative decision-making arm of the Goodsill partnership and made the decision to terminate Kamaka.

6. In addition to Larry Song's role as Kamaka's newly assigned supervisor, he was also asked by David Reber of Goodsill's Management Committee to conduct a review of several matters worked on by Kamaka to determine whether adjustments should be made to client billings.

7. These areas included, *inter alia:*

 A. Your work during your probationary period must significantly improved from your work done to date.

 B. All pleadings (complaints, answers, counterclaims, cross-claims, etc.) must be given to your supervising partner in final form, *i.e.,* ready to file with the court, at least 5 working days before the filing deadline.
 1. Pleadings must be typewritten in Office-Power.

 C. All motions and memoranda of law must be given to your supervising partner in final form, *i.e.,* ready to file with the court, at least 5 working days before the filing deadline.

Goodsill called Kamaka in from family leave, formally terminated her employment, and informed her that Goodsill was referring her to the ODC because of her allegedly fraudulent billing practices.[8] · According to Kamaka, after her termination, she had difficulty finding employment, and, at one point, was refused employment purportedly based upon false statements made to the interviewing firm by a Goodsill partner.

### B. *Procedural History*

For present purposes, we summarize only briefly the chronology of material events in this intensely litigated action. A more detailed recitation of these events is set forth in the discussion section, *infra,* as they become necessary to the resolution of the issues raised on appeal.

### 1. Kamaka's Complaint and First Amended Complaint

Kamaka filed the instant action on October 1, 1997, originally setting forth nine counts and asserting eleven separate claims for relief as follows: (1) defamation; (2) tortious interference with business relations; (3) injurious falsehood; (4) invasion of privacy; (5) breach of implied contract based on Goodsill's employee handbook; (6) breach of implied contract based on Goodsill's employee manual; (7) violation of family leave law; (8) violation of civil rights (pregnancy discrimination); (9) IIED; (10) negligent infliction of emotional distress (NIED); and (11) malicious prosecution.[9] Thereafter, on February 4, 2002, Kamaka amended her complaint to add a tenth count—and twelfth claim for relief—for negligent investigation.

### 2. Goodsill's Substantive Motions

During the course of the litigation, Goodsill filed numerous motions for summary judgment, partial summary judgment, or dismissal. The circuit/trial court granted all of Goodsill's motions with respect to the following claims: (1) malicious prosecution; (2) tortious interference with business relations;[10] (3) negligent investigation; (4) injurious falsehood; (5) breach of implied contract based on Goodsill's employee handbook; (6) violation of family leave law; and (7) NIED. On appeal, Kamaka challenges the circuit/trial court's rulings with respect to the first three claims listed above, which are discussed in further detail below.

#### a. *Kamaka's malicious prosecution claim*

Kamaka's claim of malicious prosecution was based upon Goodsill's complaint to the ODC. On November 23, 1998, Goodsill moved for partial summary judgment as to, *inter alia,* the malicious prosecution claim, based upon the immunity provision of Rules of the Supreme Court of Hawai'i (RSCH) Rule 2.8 (1998), which provides in pertinent part that "[c]omplaints submitted to the Board or Counsel [of the ODC] or testimony given with respect thereto … shall be absolutely privileged[,] and no lawsuit predicated thereon may be instituted." Kamaka, in opposing Goodsill's motion, essentially maintained that Goodsill's conduct was so onerous that RSCH Rule 2.8's absolute immunity should not ap-

---

8. The ODC subsequently determined that there was "insufficient evidence to clearly support a finding of a disciplinary violation" by Kamaka.

9. Kamaka asserted separate claims for breach of implied contract based on both the employee handbook and employee manual in one count. Likewise, Kamaka asserted both IIED and NIED in one count. With respect to the breach of implied contract based on the handbook and the employee manual, Kamaka specifically alleged that the handbook and the employee manual, which she received at the commencement of her employment, "created an implied contract upon which [Kamaka] relied with respect to the procedures that [Goodsill] was bound to follow before termination would occur," discussed fully *infra.*

Kamaka, thus, claimed that Goodsill breached the implied duty owed to Kamaka pursuant to the handbook and the manual via its failure to follow the procedures stated therein.

10. It should be noted here that, although originally styled as a claim for tortious interference with business relations, the record indicates that the parties litigated that claim as one for "tortious interference with prospective contractual relations," as recognized in *Kutcher v. Zimmerman,* 87 Hawai'i 394, 957 P.2d 1076 (App.1998). Inasmuch as the parties, on appeal, continue to refer to Kamaka's claim as one for tortious interference with prospective contractual relations, the remainder of this opinion refers to that claim as such.

ply. The circuit court disagreed and granted Goodsill's motion with respect to the malicious prosecution claim, entering its written order on January 29, 1999.

On March 15, 2002, Kamaka filed a motion for reconsideration, urging the trial court to reconsider its earlier grant of summary judgment on her malicious prosecution claim. Therein, Kamaka asserted that authority from other states—Oregon, California, and Louisiana—indicated that malicious prosecution claims should be allowed in the context of attorney disciplinary proceedings. The trial court disagreed. The written order denying Kamaka's motion for reconsideration was entered on April 23, 2002.

b. *Kamaka's tortious interference with prospective contractual relations claim*

Kamaka alleged that she was refused employment because of false statements made by a Goodsill partner to a prospective employer and that, therefore, Goodsill tortiously interfered with prospective contractual relations. On January 9, 2002, Goodsill moved for partial summary judgment as to, *inter alia*, Kamaka's aforementioned claim. Goodsill maintained, *inter alia*, that its discovery efforts had revealed there was no job offer and, therefore, no prospective contractual relationship existed. In opposition, Kamaka argued that her assertion that a job offer existed must be regarded as true inasmuch as, in the context of a motion for summary judgment, the evidence must be considered in the light most favorable to the non-moving party. The trial court, in granting summary judgment in favor of Goodsill, found that the record was devoid of any evidence that a prospective contractual relationship existed, concluding that Kamaka "could not meet and prove" the elements of her claim. The trial court's written order granting Goodsill's summary judgment as to Kamaka's tortious interference with prospective contractual relations claim was entered on February 25, 2002.

c. *Kamaka's negligent investigation claim*

Kamaka alleged that Goodsill's investigation of her billing practices was recklessly and negligently conducted and that, as "a direct and proximate result" thereof, she suffered, *inter alia*, "mental and emotional distress." On February 14, 2002, Goodsill filed a motion to dismiss Kamaka's negligent investigation claim, asserting that Kamaka had failed to state a claim upon which relief could be granted. Essentially, Goodsill argued: (1) "an employee is barred by the exclusivity provision of [Hawaii's workers' compensation law] from asserting claims for negligence against his or her employer; and (2) Goodsill did not owe [Kamaka] a duty to investigate, much less investigate carefully, her fraudulent timekeeping prior to terminating her employment." In opposition, Kamaka argued, *inter alia*, that Goodsill was not acting in its capacity as her employer when investigating her billing practices and that, therefore, the workers' compensation exclusivity provision did not apply. By written order entered on May 10, 2002, the trial court granted Goodsill's motion, dismissing Kamaka's negligent investigation claim.

3. **Kamaka's Motion for Leave to File a Second Amended Complaint**

On appeal, Kamaka also challenges the trial court's denial of her motion for leave to file a second amended complaint.[11] In that motion, filed on March 15, 2002, Kamaka essentially maintained that newly discovered facts supported amending her complaint to include claims for bad faith investigation and breach of implied contract/promissory estoppel based on Goodsill's probation letter. Goodsill, in opposition, argued that: (1) Kamaka's attempt to amend, just four weeks prior to trial (set for April 22, 2002), constituted undue delay and, if granted, would result in prejudice to Goodsill's ability to properly prepare for trial; (2) because no court had recognized a claim for bad faith investigation in the employment context, such claim would be futile; and (3) because

11. On appeal, Kamaka also challenges the trial court's second denial of her motion for leave to file a second amended complaint (*i.e.,* motion to

amend complaint to conform to the evidence), which was made during trial, discussed *infra*.

no reasonable jury could construe Goodsill's probation letter to imply a contract, Kamaka's breach of implied contract/promissory estoppel must fail. By written order, dated April 15, 2002, the trial court denied Kamaka's motion for leave to amend her first amended complaint.

### 4. The Trial

#### a. *Goodsill's motions in limine*

On May 3, 2002, Goodsill filed numerous motions in limine wherein it sought a variety of evidentiary rulings from the trial court. Pertinent among these was a motion seeking to exclude all evidence related to the ODC complaint, pursuant to RSCH Rule 2.8, quoted *infra* note 15, RSCH Rule 2.22 (1994),[12] and Hawai'i Rules of Evidence (HRE) Rule 403 (1993) (governing the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice").

Kamaka argued in opposition that, although RSCH Rule 2.8 creates immunity from liability based upon an ODC complaint, it does not create an evidentiary privilege. Kamaka further argued that, rather than exclusion, the appropriate cure for any HRE Rule 403 prejudice was a limiting jury instruction, pursuant to HRE Rule 105 (1993),[13] "to the effect that the evidence was being presented for a specific purpose, that Goodsill has immunity by law, and liability may not be found on the basis of the protected acts in and of themselves."

At the May 30, 2002 hearing on the matter, the trial court granted Goodsill's motion in part, excluding: (1) any evidence of the initial meeting between Goodsill and the ODC; (2) any communications to the ODC occurring after Goodsill submitted its complaint; and (3) the ultimate findings of the ODC. The trial court reserved ruling as to the remaining evidence in dispute and directed Goodsill to identify the specific exhibits from Kamaka's exhibit list that Goodsill contended would fall within the scope of its motion.

Thereafter, Goodsill filed a supplemental memorandum on June 14, 2002 that included the required list of the seventy-four exhibits at issue. At the June 19, 2002 hearing, the trial court excluded some exhibits, ordered redaction of any mention of the ODC for the permitted exhibits or testimony, and reserved ruling on the remaining exhibits and testimony.

#### b. *the jury trial*

Jury trial commenced on June 24, 2002 on the five remaining claims: (1) defamation; (2) invasion of privacy; (3) breach of contract based on the employee manual; (4) violation of civil rights (pregnancy discrimination); and (5) IIED. During trial, the first two claims—defamation and invasion of privacy—were resolved in favor of Goodsill through the trial court's grant of Goodsill's motions for judgment as a matter of law, pursuant to HRCP Rule 50(a) (2000),[14] which claims Kamaka does not appeal. The three remaining claims were eventually submitted to the jury.

---

12. RSCH Rule 2.22, entitled "Confidentiality," states in pertinent part:
 (a) General rule. The files, records and proceedings of the Board, the hearing committees or officers, and Counsel, as they may relate to or arise out of any complaint or charge of unprofessional conduct against or investigation of an attorney, shall be deemed confidential and shall not be disclosed.

13. HRE Rule 105 states in relevant part:
 When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.

14. HRCP Rule 50(a), entitled "Judgment as a matter of law," states:

(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.
(2) Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.

On July 17, 2002, in the midst of trial, Kamaka filed a motion for leave to file second amended complaint to conform to the evidence, specifically arguing that:

> [D]uring the trial, [Kamaka] testified without Goodsill's objection regarding the promises made by Goodsill when it placed [Kamaka] on probation. Moreover, on [Kamaka's] cross-examination, Goodsill elicited further testimony regarding both express and implied promises it had made to [Kamaka] on or about November 20, 1995 [ (the date Kamaka received the probation letter) ]. Gary Slovin and David Reber [ (partners at Goodsill) ] both also extensively testified, as adverse witnesses, about the representations in the probation letter, without objection.

Consequently, Kamaka contended that, because Goodsill "consented to trial these issues," she should be entitled to amend her complaint to add a count for breach of contract and promissory estoppel based on the probation letter. Following hearing on July 22, 2002, the trial court orally denied Kamaka's motion.

Thereafter, on July 29, 2002, the jury returned its special verdict, finding in favor of Goodsill as to the violation of civil rights and IIED claims; the jury found in favor of Kamaka on the breach of implied contract claim based on the employee manual, awarding her $209,937.91.

## 5. Post–Trial Motions

On December 20, 2002, Kamaka filed a motion for attorneys' fees and costs. Before a ruling was made by the trial court, Goodsill filed a renewed motion for judgment as a matter of law as to Kamaka's breach of implied contract claim based on the employee manual on January 9, 2003. On October 9, 2003, the trial court granted Goodsill's renewed motion and, in view of that ruling, denied Kamaka's motion for attorney's fees and costs as moot. Thereafter, on October 23, 2003, Goodsill filed a motion for attorneys' fees and costs, wherein it sought $364,154.25 in fees and $65,081.48 in costs. By order filed on December 24, 2003, the trial court awarded Goodsill the entire $364,154.25 in attorneys' fees, but reduced the award of costs to $64,865.24. That same day, the trial court issued a final judgment in favor of Goodsill as to all claims. This timely appeal and cross-appeal followed.

In sum, the table below reflects: (1) Kamaka's twelve claims for relief; (2) the disposition dates of each claim; and (3) the manner in which each claim was disposed at the pre-trial, trial, or post-trial stage of the proceedings. The bolded entries signify the rulings that Kamaka has appealed. Kamaka additionally appeals the trial court's denial of her motion for leave to file a second amended complaint and grant of Goodsill's post-trial motion for attorneys' fees and costs.

| Claims | Date Disposed | Pre-trial Stage | Trial Stage | Post-Trial Stage |
|---|---|---|---|---|
| Defamation | 08/14/02 | | MJML | |
| **Tortious interference with prospective contractual relations** | 02/25/02 | **MPSJ** | | |
| Injurious falsehood | 05/10/02 | MPSJ | | |
| Invasion of Privacy | 08/14/02 | | MJML | |
| Breach of implied contract (re: employee handbook) | 09/08/00 | MPSJ | | |
| **Breach of implied contract (re: employee manual)** | 10/09/03 | | **Special Verdict for Kamaka** | **Renewed MJML** |
| Violation of family leave law | 01/29/99 | MSJ | | |
| Violation of civil rights (pregnancy discrimination) | 07/29/02 | | Special Verdict | |
| NIED | 09/08/00 | MPSJ | | |
| IIED | 07/29/02 | | Special Verdict | |
| **Malicious prosecution** | 01/29/99 | **MSJ** | | |
| **Negligent investigation** | 05/10/02 | **MDM** | | |

MDM = Motion to Dismiss; MJML = Motion for Judgment as a Matter of Law; MPSJ/MSJ = Motion for Partial Summary Judgment/Summary Judgment

## II. STANDARDS OF REVIEW

### A. Summary Judgment

This court reviews a trial court's grant of summary judgment *de novo*. *Oʻahu Transit Servs., Inc. v. Northfield Ins. Co.*, 107 Hawaiʻi 231, 234, 112 P.3d 717, 720 (2005). The standard for granting a motion for summary judgment is well settled:

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, [this court] must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Price v. AIG Hawaiʻi Ins. Co.*, 107 Hawaiʻi 106, 110, 111 P.3d 1, 5 (2005) (original brackets and citation omitted).

### B. Motion to Dismiss

A trial court's ruling on a motion to dismiss is reviewed *de novo*. *Wright v. Home Depot U.S.A., Inc.*, 111 Hawaiʻi 401, 406–07, 142 P.3d 265, 270–71 (2006).

### C. Motion to Amend Complaint

This court reviews a denial of leave to amend a complaint under HRCP Rule 15(a) or (b) under the abuse of discretion standard. *Gonsalves v. Nissan Motor Corp.*, 100 Hawaiʻi 149, 158, 58 P.3d 1196, 1205 (2002) (regarding Rule 15(a)); *Hamm v. Merrick*, 61 Haw. 470, 473, 605 P.2d 499, 502 (1980) (regarding Rule 15(b)).

The trial court abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence. Stated differently, an abuse of discretion occurs where the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

*Chun v. Bd. of Trs. of the Employees Ret. Sys. of the State of Hawaiʻi*, 106 Hawaiʻi 416, 430, 106 P.3d 339, 353 (2005) (citations omitted).

### D. Motion for Reconsideration

The trial court's ruling on a motion for reconsideration is reviewed under the abuse of discretion standard. *Cho v. State*, 115 Hawaiʻi 373, 381, 168 P.3d 17, 25 (2007). Moreover,

[a]s this court has often stated, "the purpose of a motion for reconsideration is to allow the parties to present new evidence and/or arguments that could not have been presented during the earlier adjudicated motion." Reconsideration is not a device to relitigate old matters or to raise arguments or evidence that could and should have been brought during the earlier proceeding.

*Sousaris v. Miller*, 92 Hawaiʻi 505, 513, 993 P.2d 539, 547 (2000) (original brackets and citations omitted).

### E. Evidentiary Rulings

As a general rule, this court reviews evidentiary rulings for abuse of discretion. *Kealoha v. County of Hawaiʻi*, 74 Haw. 308, 319, 844 P.2d 670, 676 (1993). However, when there can only be one correct answer to the admissibility question, or when reviewing questions of relevance under HRE Rules 401 and 402, this court applies the right/wrong standard of review. *Id.* at 319, 844 P.2d at 676; *State v. White*, 92 Hawaiʻi 192, 204–05, 990 P.2d 90, 102–03 (1999).

### F. Judgment as a Matter of Law

"[V]erdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings." *Tsugawa v. Reinartz*, 56 Haw. 67, 71, 527 P.2d 1278, 1282 (1974). [This court] ha[s] defined "substantial evidence" as "credible evidence which is of

sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion."

. . . .

In deciding a motion for [judgment as a matter of law or renewed motion for judgment as a matter of law], the evidence and the inferences which may be fairly drawn [from the evidence] must be considered in the light most favorable to the non-moving party and either motion may be granted only where there can be but one reasonable conclusion as to the proper judgment.

*Richardson v. Sport Shinko (Waikiki Corp.)*, 76 Hawai'i 494, 502, 880 P.2d 169, 177 (1994).

### G. *Attorneys' Fees and Costs*

 "The [trial] court's grant or denial of attorneys' fees and costs is reviewed under the abuse of discretion standard." *Kahala Royal Corp. v. Goodsill Anderson Quinn & Stifel*, 113 Hawai'i 251, 266, 151 P.3d 732, 747 (2007) (citation omitted).

### III. *DISCUSSION*

### A. *Kamaka's Malicious Prosecution Claim*

Kamaka argues that the circuit court erred in granting summary judgment in favor of Goodsill on her claim for malicious prosecution. In asserting her claim for malicious prosecution, Kamaka alleged, *inter alia*, that "[Goodsill] filed the complaint with the ODC in bad faith, without probable cause and with malice" and that, "[a]s a direct and proximate result of [Goodsill]'s actions, [Kamaka] has been injured and sustained damages in an amount to be proven at trial."

As previously stated, Goodsill moved for partial summary judgment, arguing that

RSCH Rule 2.8 [15] unambiguously barred Kamaka's claim for malicious prosecution. Kamaka, on the other hand, maintained that, "in the case of absolute immunity[,] ... there are complaints and associated conduct, such as defamation, that are not prohibited by immunity. This is one of those cases." On January 29, 1999, the circuit court granted Goodsill's motion. On May 15, 2002, Kamaka filed a motion for reconsideration, arguing that the immunity arising under Rule 2.8 does not extend to claims alleging malicious prosecution. On April 23, 2002, the trial court denied Kamaka's motion for reconsideration.

 On appeal, Kamaka specifically contends that the immunity arising under RSCH Rule 2.8 is not applicable to a claim for malicious prosecution. Goodsill counters that, pursuant to the plain language of RSCH Rule 2.8, complaints to the ODC are absolutely privileged and "no lawsuit of any kind, including a claim for malicious prosecution, may be predicated thereon." In support of her position, Kamaka points to two cases from other jurisdictions where suits for malicious prosecution have been excepted from "the litigation privilege" [16]: (1) *Ramstead v. Morgan*, 219 Or. 383, 347 P.2d 594, 601 (1959) (holding malicious prosecution actions permissible because the "policy of encouraging free access to the courts ... is outweighed by the policy of affording redress for individual wrongs when the requirements of favorable termination, lack of probable cause, and malice are satisfied"); and (2) *Silberg v. Anderson*, 50 Cal.3d 205, 266 Cal. Rptr. 638, 786 P.2d 365, 371 (1990) (same). These cases, however, are distinguishable because (1) RSCH Rule 2.8 does not merely

---

15. RSCH Rule 2.8, entitled "Immunity," provides as follows:

Complaints submitted to the Board or Counsel or testimony given with respect thereto or trustee proceedings conducted pursuant to Rule 2.20 shall be absolutely privileged and no lawsuit predicated thereon may be instituted. Members of the Board, members of the hearing committees, hearing officers, Counsel, staff, volunteers, experts appointed pursuant to Rule 2.19, and trustees and assistants appointed pursuant to Rules 2.20 and 2.5 shall be immune from suit and liability for any conduct in the course of their official duties.

16. This court has previously explained that "the litigation privilege is generally applicable to bar a civil litigant's claim for civil damages against an opposing party's attorney if the alleged act of the attorney occurs in the course of the attorney's representation of an opposing party and is conduct related to the civil action." *Kahala Royal Corp.*, 113 Hawai'i at 269, 151 P.3d at 750 (emphasis omitted) (citation omitted). This court has also held that the litigation privilege is applicable to an attorney's representation of a client in quasi-judicial proceedings including arbitration. *Id.* at 272–73, 151 P.3d at 753–34.

restate the litigation privilege, but affords complainants absolute privilege and (2) neither case interpreted a rule or statute similar to RSCH Rule 2.8.

Kamaka also relies on *Goldstein v. Serio*, 496 So.2d 412, 415 (La.Ct.App.1986), for the proposition that absolute privilege is not an affirmative defense to a malicious prosecution action. In *Goldstein*, the plaintiffs,

who [were] attorneys, instituted suit against the defendants, their former clients, seeking damages for defamation, malicious prosecution and abuse of process after [the] defendants' complaints to the Louisiana State Bar Association's Committee on Professional Responsibility were dismissed based on the Committee's finding that there was "no showing of any unethical conduct." The trial court maintained the exception of no cause of action, holding that the statements made to the Louisiana State Bar Association were absolutely privileged, and thus, an affirmative defense existed which defeated plaintiffs' actions.

*Id.* at 413. On appeal, the Louisiana Supreme Court, in deciding whether the defendant's statements to the Louisiana State Bar Association were absolutely privileged, considered article XV, section 16 of the Articles of Incorporation of the Louisiana State Bar Association [hereinafter, the Louisiana rule], which provided:

Complaints filed with the [disciplinary c]ommission in accordance with these rules shall be absolutely privileged and all communications and evidence predicated thereon shall not be admissible in any court in this State in proceedings against the person filing such complaints. *Members of the [disciplinary c]ommittee, its counsel, investigators and staff shall be immune from suit* for any conduct in the course of their official duties performed in accordance with these rules.

All communications between the [disciplinary c]ommittee, its counsel, investigators and staff shall be privileged and shall not be admissible as evidence in any proceeding other than those authorized under Article XV hereof.

*Id.* at 413 (quoting the Louisiana rule) (emphasis added). In reversing part of the trial court's judgment, the Louisiana Supreme Court held:

[B]ecause these communications, upon which plaintiffs based their action, are absolutely privileged, the trial court correctly maintained the exception of no cause of action as to the defamation claim.

On the other hand, we cannot say that the affirmative defense of absolute privilege defeats plaintiffs' malicious prosecution and abuse of process actions. Whereas, the defense of absolute privilege has been jurisprudentially recognized to defeat a defamation action, we can find no authority which states that absolute privilege is an affirmative defense to malicious prosecution or abuse of process.

An affirmative defense raises new matters which, assuming the allegations to be true, constitute a defense to the action which has the effect of defeating the plaintiff's demand on the merits. Thus, for the exception of no cause of action to be maintained as to the malicious prosecution and abuse of process claims, the defense of absolute privilege must defeat the elements of each action.

. . . The affirmative defense of absolute privilege applies only to statements communicated to third person[s]. *Malicious prosecution, however, is not concerned with the statements made during a proceeding but rather with the intent of the parties in instituting the original proceeding.* Therefore, we can not hold that absolute privilege is an affirmative defense to a malicious prosecution action.

*Id.* at 414–15 (citations omitted) (emphasis added).

Although the Louisiana rule provided an evidentiary privilege for communications and evidence predicated on a disciplinary complaint, as well as immunity for members of the disciplinary committee, its counsel, investigators and staff, it did not provide complainants with immunity from suit or liability as does RSCH Rule 2.8, which explicitly bars lawsuits predicated on disciplinary complaints. *See* RSCH Rule 2.8 ("Complaints submitted to the Board or Counsel [of the

ODC] or testimony given with respect thereto or trustee proceedings conducted pursuant to Rule 2.20 shall be absolutely privileged and no lawsuit predicated thereon may be instituted.")

We are not persuaded by the authorities upon which Kamaka relies and believe the rationale of the Kansas Supreme Court in *Jarvis v. Drake*, 250 Kan. 645, 830 P.2d 23 (1992), to be more persuasive. In *Jarvis*, an attorney brought suit for malicious prosecution against an individual who made a disciplinary complaint against him. *Id.* at 24. Kansas Supreme Court Rules (KSCR) Rule 223 provided immunity from suit:

> Complaints, reports, or testimony in the course of disciplinary proceedings under these Rules shall be deemed to be made in the course of judicial proceedings. *All participants* shall be entitled to judicial immunity and all rights, privileges and immunities afforded public officials and other participants in actions filed in the courts of this state.

*Id.* at 25 (quoting KSCR Rule 223) (emphasis added). The plaintiff-attorney appealed the trial court's grant of summary judgment in favor of the defendant. *Id.* at 26. On appeal, the plaintiff-attorney argued that KSCR Rule 223 "was not intended to abolish the common-law cause of action for malicious prosecution." *Id.* The plaintiff-attorney further asserted that the act of filing a disciplinary complaint was not a privileged communication. The Kansas Supreme Court, in its opinion, explained that, "[w]e find ourselves in the unique role of interpreting our own rule. If Rule 223 were ambiguous, then our intent in adopting the rule and amendment would be controlling. We do not find the rule to be ambiguous." *Id.* at 27. The court further explained that:

> [The plaintiff-attorney]'s argument seems to be that statements made by [the defendant] in his complaint are protected under the rule, but that the conduct of [the defendant] in filing the complaint with the disciplinary administrator is not protected. We find no such distinction in [KSCR] Rule 223. It provides protection for persons. There is nothing in the text of the rule which would indicate that the protec-

tive cloak may or may not be donned depending on whether it is needed on account of statements or conduct.

*Id.* Thus, the Kansas Supreme Court held that "[t]he grant of immunity afforded by Rule 223 is absolute and precludes the plaintiff from filing a malicious prosecution action against [the defendant]." *Id.*

 Like the Kansas Supreme Court in *Jarvis*, this court is in the unique position of interpreting its own rule. "[W]hen interpreting rules promulgated by the [this] court, principles of statutory construction apply." *Kawamata Farms, Inc. v. United Agri Prods.*, 86 Hawai'i 214, 255, 948 P.2d 1055, 1096 (1997). "[I]t is a cardinal rule of statutory interpretation that, where the terms of a statute are plain, unambiguous and explicit, we are not at liberty to look beyond that language for a different meaning." *State v. Smith*, 103 Hawai'i 228, 234, 81 P.3d 408, 414 (2003). An ambiguity exists when "there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression[.]" *Peterson v. Hawaii Elec. Light Co.*, 85 Hawai'i 322, 328, 944 P.2d 1265, 1271 (1997) (citation omitted). Here, the language of RSCH Rule 2.8 clearly and unambiguously states that "no lawsuit predicated upon [complaints or testimony given with respect thereto] may be instituted." Thus, we hold that malicious prosecution suits are barred.

Kamaka argues, in the alternative, that, "if the immunity absolutely bars malicious prosecution suits, that it should extend only to members of the public and not employers of fellow lawyers." Again, the clear and unambiguous language of Rule 2.8 does not distinguish between persons or identify a preferred class, nor has Kamaka presented controlling authority identifying such a distinction.

Accordingly, inasmuch as the language of RSCH Rule 2.8 is clear and unambiguous, we hold that the trial court did not err in granting summary judgment in favor of Goodsill on Kamaka's malicious prosecution claim.

B. *Kamaka's Claim for Tortious Interference With Prospective Contractual Relations*

 Kamaka claims that the trial court erred in granting summary judgment in fa-

vor of Goodsill on Kamaka's claim for tortious interference with prospective contractual relations. Her entire argument consists of one paragraph in her opening brief:

> In opposition to the motion, Kamaka stated the following genuine issues of fact:
> - Four attorneys of the Case [Myrdal Bigelow and Lombardi f]irm (two name partners) interviewed Kamaka and she was asked back for a second interview;
> - In between, [John] Myrdal contacted a Goodsill attorney to inquire about Kamaka, who, according to Myrdal, informed him that she had billed for meetings which had not occurred;
> - Myrdal told Kamaka that Goodsill's accusations were serious and Myrdal never told Kamaka that the Case Firm did not have a position for her;
> - In contrast, Myrdal told Kamaka that the Case Firm could not take action until the ODC Complaint had been resolved and encouraged [Kamaka] to try to get the ODC to expedite the process.

Based on the factual evidence in dispute, the [trial c]ourt abused its discretion by granting summary judgment on this claim.

Kamaka asserts that, in opposing Goodsill's January 9, 2002 motion before the trial court, she raised several "genuine issues of fact." However, she fails to explain how such evidence was material to the elements of her claim. Furthermore, she has offered absolutely no argument contesting the trial court's determination that Goodsill was entitled to judgment as a matter of law. Thus, in failing to explain the *reasons* for her contentions, we hold that Kamaka has waived this point pursuant to HRAP Rule 28(b)(7) (2007).[17]

## C. *Kamaka's Claim for Negligent Investigation*

▇▇▇ Kamaka also contends the circuit court erred in granting Goodsill's motion to dismiss her negligent investigation claim. As previously stated:

> A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim that would entitle him or her to relief. [This court] must therefore view a plaintiff's complaint in a light most favorable to him or her in order to determine whether the allegations contained therein could warrant relief under any alternative theory. For this reason, in reviewing [a] circuit court's order dismissing [a] complaint . . . [this court's] consideration is strictly limited to the allegations of the complaint, and [this court] must deem those allegations to be true.

*In re Estate of Rogers*, 103 Hawai'i 275, 280–81, 81 P.3d 1190, 1195–96 (2003) (citations omitted) (some brackets and ellipsis in original) (some brackets added). Kamaka alleged that Goodsill's investigation of her billing practices was undertaken "in a negligent and reckless manner" and that, as "a direct and proximate result" thereof, she suffered, *inter alia*, "mental and emotional distress."

▇▇▇ HRS § 386–3 (1993) provides in relevant part:

> If an employee suffers personal injury either by accident arising out of and in the course of the employment . . ., the employee's employer . . . shall pay compensation to the employee . . . as hereinafter provided.
>
> Accident arising out of and in the course of the employment includes the wilful act of a third person directed against an employee because of the employee's employment.

However, Goodsill, in moving to dismiss, argued that "an employee is barred by the exclusivity provision of [Hawaii's workers' compensation law, HRS § ]386–5 [ (1993),] from asserting claims for negligence against his or her employer." HRS § 386–5, entitled "Exclusiveness or right to compensation; ex-

---

17. HRAP Rule 28(b)(7) provides that "the appellant shall file an opening brief, containing . . . [an] argument, containing the contentions of the appellant on the points presented and the reasons therefore, with citations to the authorities, statutes and parts of the record relied on. . . . Points not argued may be deemed waived."

ception[,]" (bold emphasis omitted), provides in pertinent part:

> The rights and remedies herein granted to an employee or the employee's dependents on account of a work injury [18] suffered by the employee shall exclude all other liability of the employer to the employee ... at common law or otherwise, on account of the injury, except for sexual harassment or sexual assault and infliction of emotional distress or invasion of privacy **related thereto**, in which case a civil action may also be brought.

(Emphases added.) Based on a plain reading, HRS § 386–5 unambiguously provides that claims for infliction of emotional distress or invasion of privacy are not subject to the exclusivity provision when such claims arise from claims for sexual harassment or sexual assault, in which case a civil action may be brought. Inasmuch as Kamaka has alleged a claim for emotional distress, that does **not** arise out of sexual harassment or sexual assault, such claim is, pursuant to HRS § 386–5, barred.

Nevertheless, Kamaka also contends on appeal that (1) Goodsill was not acting in its capacity as her employer when it investigated; therefore, the workers' compensation exclusivity rules did not apply and, (2) once an investigation is commenced, the at-will doctrine is inapplicable and an investigating employer owes a duty of care in the conduct of that investigation. In support of her position, Kamaka urges this court to adopt the "dual persona" doctrine and points to a Massachusetts case that explains the doctrine:

> The dual persona theory provides that an employer may be regarded as a third party and thus be subject to suit, if the employer's liability to the injured employee derives from a second persona so completely independent from and unrelated to his status as employer that by established standards the law recognizes it as a separate legal person. The relevant inquiry in

a dual persona allegation is not whether a separate theory of liability could be argued against the same legal person, but rather whether the controversy involves a separate legal entity.

*Barrett v. Rodgers,* 408 Mass. 614, 562 N.E.2d 480, 482 (1990) (citations omitted). In *Barrett,* an employee was injured when attacked by his employer's dog during the course of his employment. *Id.* After receiving workers' compensation benefits, the injured employee attempted to, despite the prohibitions in the Massachusetts workers' compensation laws, maintain a separate tort action against the employer as the owner of the dog, despite the prohibitions in the Massachusetts workers' compensation laws, by invoking the "dual persona" doctrine. *Id.* In declining to adopt the doctrine, the Massachusetts Supreme Judicial Court held that the employee was not entitled to maintain the suit, reasoning that the employer was a single legal entity because his obligations as a dog owner were related to his obligations as an employer to provide a safe working environment. *Id.* at 482–83.

Kamaka theorizes that Goodsill had a "dual persona"—a legal entity as her employer and a separate legal entity as attorneys. Because Goodsill was acting under its attorney-persona when it negligently investigated her and not as her employer, Kamaka submits that Goodsill is precluded from asserting the workers' compensation immunity defense. We disagree.

Similar to the employer in *Barrett,* Goodsill's obligations as attorneys were related to its obligations as a law firm to protect its clients from unscrupulous employees engaging in unethical billing practices. As Goodsill points out, "the [HRPC] expressly requires law firm partners to take such remedial actions in their capacity as 'employers' and 'supervisors' of associate attorneys. *See* HRPC [Rules] 5.1 [and 8.3(a) (2005)]." [19]

---

18. HRS § 386–1 (1993) defines "work injury" as "a personal injury suffered under the conditions specified in section 386–3[,]" quoted *supra.*

19. HRPC Rules 5.1 and 8.3(a) and commentary state:

Rule 5.1. RESPONSIBILITIES OF A PARTNER OR SUPERVISORY LAWYER.
(a) A partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the rules of professional conduct.

Therefore, even if this court were to recognize and apply the "dual persona" doctrine, there was no "separate legal entity" conducting the investigation of Kamaka's billing practices.

■■■ Kamaka further argues that "Goodsill took the position that it was acting in its capacity (and claiming immunity) *as lawyers* and not as her employer. [Therefore, t]he 'dual persona' doctrine (as well as *Rosa v. CWJ Contractors, Ltd.* [ (relating to judicial estoppel [20]) ] ) precludes Goodsill's inconsistent defense of immunity [under HRS § 386–5] as [an] employer." Goodsill answers that, under the HRPC, its role as both attorneys and an employer was not inconsistent. We agree with Goodsill. The commentary to HRPC Rule 5.1, quoted *supra* note 19, specifically imposes the responsibilities of supervising attorneys to a "law firm organized as a professional corporation." A law firm, faced with allegations of fraudulent billing practices by one of its associates, has both a duty to the affected-client and related duties to the profession: (1) the client's account must be examined for any billing ir-

regularities; (2) reasonable remedial action must be taken; and (3) pursuant to HRPC Rule 8.3(a), should this process raise "a substantial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects," the law firm "shall inform the appropriate professional authority." Without an examination of the clients' accounts, which Kamaka alleges constituted the negligent investigation, billing irregularities, if any, cannot be corrected. By the same token, without an examination of the clients' accounts, the law firm cannot determine what appropriate remedial action, if any, is required under the HRPC. Therefore, Goodsill's duty as an employer was consistent with its duties as a law firm, *i.e.*, as attorneys.

■■■ Kamaka also contends that, once an investigation is commenced, the at-will doctrine is inapplicable and an investigating employer owes a duty of care in the conduct of that investigation. Specifically, Kamaka argues:

> (b) A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the rules of professional conduct.
> (c) A lawyer shall be responsible for another lawyer's violation of the rules of professional conduct if:
> (1) the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved; or
> (2) the lawyer is a partner in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.
> COMMENT: [1] Paragraphs (a) and (b) refer to lawyers who have supervisory authority over the professional work of a firm or legal department of a government agency. This includes members of a partnership and the shareholders in a law firm organized as a professional corporation; lawyers having supervisory authority in the law department of an enterprise or government agency; and lawyers who have intermediate managerial responsibilities in a firm.
> Rule 8.3. REPORTING PROFESSIONAL MISCONDUCT.
> (a) A lawyer having knowledge that another lawyer has committed a violation of the rules of professional conduct that raises a substan-

> tial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, shall inform the appropriate professional authority.
> COMMENT: [1] Self-regulation of the legal profession requires that members of the profession initiate disciplinary investigation when they know of a violation of the Rules of Professional Conduct. Lawyers have a similar obligation with respect to judicial misconduct. An apparently isolated violation may indicate a pattern of misconduct that only a disciplinary investigation can uncover. Reporting a violation is especially important where the victim is unlikely to discover the offense.

20. In a footnote to the reference to the *Rosa* case, Kamaka states her entire judicial estoppel argument as follows:

> "This [judicial estoppel] preclusion estops a party from assuming inconsistent positions in the course of the same judicial proceeding." *Rosa v. CWJ Contractors, Ltd.*, 4 Haw.App. 210, 219, 664 P.2d 745, 752 [ (1983) ] (citations omitted).

Although Kamaka bears the burden of showing error in the trial court's decision, *see Bettencourt v. Bettencourt*, 80 Hawai'i 225, 230, 909 P.2d 553, 558 (1995), she provides no analysis in support of her position that judicial estoppel precludes Goodsill from claiming immunity under HRS § 386–5. We, therefore, disregard her judicial estoppel argument.

The at-will doctrine is inapplicable because[:] (1) once Goodsill began an investigation, the authorities hold Goodsill to a duty to use reasonable care in conducting its investigation; (2) Goodsill had a policy of probation; and (3) this case falls within the recognized public policy exception relating to violations of professional ethical rules [ (citing, in a footnote, to *Smith v. Chaney Brooks Realty, Inc.,* 10 Haw.App. 250, 256–58, 865 P.2d 170, 173–74 (1994)) ].

If Kamaka were at-will, once Goodsill went forward with its investigation, the law imposes a duty of care. [Hawaii]'s public policy on the conduct of lawyers is comprehended by the [HRPC]. Goodsill's termination of Kamaka was in conjunction with, and preceded by the intent, and for the purpose, [sic] of violating and abusing these rules. Goodsill obstructed Kamaka from being able to get evidence in her own defense. Its counsel, knowing that Goodsill was an adversary to Kamaka, failed to disclose his own capacity, or to advise her to obtain counsel. [HRPC] Rule 4.3. Its supervising partners failed to oversee [sic], rather, encouraged deceitful, overzealous efforts by associates to harass and intimidate Kamaka. It offered a narrow group of negative evidence procured through a biased process, while suppressing broad categories of favorable and exculpatory evidence. These ethical violations create an exception to the at-will rule.

(Citations to the record omitted.) With regard to Kamaka's bare citation to *Smith,* Goodsill notes that, although Kamaka "cites [to *Smith* ], this case does not address the standard of care during an investigation into an employee's misconduct. This case deals with a claim of wrongful discharge in violation of public policy." Goodsill further asserts that:

Kamaka argues that the "public policy" exception to the at-will doctrine applies because Goodsill itself violated the ethical rules during its investigation of Kamaka. This argument must be rejected because Kamaka's [f]irst [a]mended [c]omplaint does not assert a claim for wrongful discharge in violation of public policy. This claim and related arguments were not raised below.

First, this court "need not consider a point which was not presented in the trial court in an appropriate manner." HRS § 641–2 (Supp.2006). Second, if Kamaka did, in fact, raise such arguments below, she has failed to specifically state "the alleged error [that was] committed by the court," HRAP Rule 28(b)(4) (2007), as well as "where in the record the alleged error occurred[ ] and ... where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency." *Id.* ("Points not presented ... will be disregarded[.]"). Finally, "the burden is on [Kamaka] in [this] appeal to show error by reference to matters in the record[.]" *Bettencourt,* 80 Hawai'i at 230, 909 P.2d at 558. In view of the fact that: (1) Kamaka did not properly raise this point before the circuit court; (2) Kamaka does not properly raise this point on appeal; and (3) Kamaka offers only a bare citation to irrelevant authority, we disregard Kamaka's argument that the public policy exception to the at-will doctrine applies.

Inasmuch as Goodsill's actions as an employer and law firm were not inconsistent and Goodsill's status as an employer and law firm involves a single legal entity for purposes of the "dual persona" doctrine, we hold that the circuit court did not err in granting Goodsill's motion to dismiss Kamaka's negligent investigation claim.

### D. *Motions to Amend Complaint*

#### 1. **Kamaka's March 15, 2002 Motion**

Kamaka argues that the trial court erred in not allowing amendments to state claims for bad faith investigation and for breach of contract and promissory estoppel based on the probation letter. As previously stated, Kamaka moved for leave to file a second amended complaint, on March 15, 2002, to (a) allege a claim for breach of contract and promissory estoppel in connection with the probation letter and (b) clarify the negligent investigation claim to state a claim for intentional bad-faith investigation. Following a hearing on April 8, 2002, the trial court determined that the motion was untimely and would cause undue prejudice to

Goodsill because the trial was scheduled to begin in two weeks.[21] The trial court's order denying the motion was filed on April 15, 2002.

Goodsill argues that "the record establishes that 'justifiable reasons' existed for denying [Kamaka's] leave to amend, including her undue delay, her failure to cure deficiencies by amendments previously allowed, the undue prejudice to Goodsill, and the futility of the proposed amendments." We agree with Goodsill that the trial court had justifiable reasons for its denial of Kamaka's motion.

HRCP Rule 15(a) provides that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." This court has explained that,

> [i]n the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as [HRCP Rule 15(a)] requires, be "freely given."

*Gonsalves*, 100 Hawai'i at 160, 58 P.3d at 1207 (citations omitted).

Kamaka had more than ample time in which to assert her proposed claims relating to the probation letter and alleged bad-faith investigation. Kamaka received the probation letter on November 20, 1995. In her pretrial statement filed on June 1, 1998, almost four years prior to her March 15, 2002

motion, Kamaka alleged that Goodsill had conducted a "bad faith campaign" to terminate her employment and ruin her reputation and that Goodsill had conducted an unfair, biased investigation. By waiting until March 15, 2002, Kamaka unduly delayed proposing her additional claims. In fact, Kamaka's motion was filed seven days after the mutually relied on general discovery deadline and on the same day as the dispositive motions deadline. Moreover, had the trial court granted Kamaka's motion, Goodsill would have been unduly prejudiced by the need to respond and conduct additional investigation, research, and discovery on the brink of trial. We, therefore, hold that the trial court did not abuse its discretion in denying Kamaka's March 15, 2002 motion.

### 2. Kamaka's July 17, 2002 Motion

■ Next, Kamaka argues that the trial court erred when it denied her July 17, 2002 motion to file a second amended complaint to conform to the evidence, pursuant to HRCP Rule 15(b) (2007),[22] by adding a claim for breach of contract and promissory estoppel based on the probation letter. As previously stated, after hearing on July 22, 2002, the trial court orally denied Kamaka's motion.

Kamaka argues that Goodsill failed to object to the admission of the evidence relevant to the unpleaded issue, actually elicited evidence bearing on the issue, and stipulated into evidence the relevant exhibit—*i.e.*, the November 20, 1995 probation letter. Thus, Kamaka suggests that Goodsill consented to the trial of her proposed claim for breach of contract and promissory estoppel based on the probation letter. We disagree.

---

**21.** At the time, the trial date was set for April 22, 2002. However, as previously indicated, trial actually commenced on June 24, 2002.

**22.** Rule 15(b) provides as follows:

Amendments to conform to the evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not

affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

(Underscored emphasis in original.)

■ This court has previously explained that "Rule 15(b) is not permissive in terms: it provides that issues tried by express or implied consent shall be treated as if raised in pleadings." *Hamm v. Merrick*, 61 Haw. 470, 474, 605 P.2d 499, 502 (1980) (citation omitted). As a general rule,

> [w]hen a party seeks to amend the pleadings to include an unpleaded [issue], the critical question is whether that unpleaded issue was tried by the implied consent of the parties.... In this jurisdiction, consent will be implied from the failure to object to the introduction of evidence relevant to the unpleaded issue.

*Id.* at 472–73, 605 P.2d at 501 (citations omitted).

■ There are two known exceptions to the general rule. First, "consent will not be implied if a party will be substantially prejudiced by [the proposed] amendment." *Cresencia v. Kim*, 10 Haw.App. 461, 478, 878 P.2d 725, 734 (1994) (citations omitted). Second,

> [w]hen the evidence that is claimed to show that an issue was tried by consent is relevant to an issue already in the case, as well as to the one that is the subject matter of the amendment, and there was no indication at trial that the party who introduced the evidence was seeking to raise a new issue, the pleadings will not be deemed amended under the first portion of Rule 15(b). The reasoning behind this view is sound since if evidence is introduced to support basic issues that already have been pleaded, the opposing party may not be conscious of its relevance to issues not raised by the pleadings unless that fact is made clear.

*Id.* at 479–80, 878 P.2d at 735 (citation omitted).

Both of the aforementioned exceptions were satisfied. Clearly, the probation letter was relevant to numerous other preexisting issues. For example, with respect to Kamaka's breach of handbook claim, the probation letter raised the question whether Goodsill followed its own procedures in terminating Kamaka. Furthermore, Goodsill would have been substantially prejudiced had the trial court allowed Kamaka to add claims for breach of contract and promissory estoppel based on the probation letter, in the middle of trial; especially following four years of pre-trial litigation and preparation, and Goodsill's proceeding to trial under the impression that Kamaka's proposed claims were no longer viable based upon the trial court denial of Kamaka's earlier March 15, 2002 motion seeking a substantially similar amendment under HRCP Rule 15(a), discussed *supra*. Had Goodsill known that the issues underlying Kamaka's proposed amendments were to be tried, it presumably would have proceeded differently with the presentation of evidence, questioning of witnesses, and argument. Because the probation letter was relevant to Kamaka's other claims, and because Goodsill would have been substantially prejudiced by the inclusion of Kamaka's proposed unpleaded issues, we hold that the trial court did not abuse its discretion in denying Kamaka's July 17, 2002 motion.

### E. *Exclusion of Evidence Related to Goodsill's ODC Complaint*

On May 3, 2002, Goodsill filed a motion in limine seeking to exclude all evidence of communications and actions related to the ODC, including: (1) Goodsill's pre-complaint communications with the ODC; (2) Goodsill's pre-complaint notes, drafts, and reports that involved, discussed, or led to Goodsill's communications with the ODC; (3) Goodsill's disciplinary complaint against Kamaka; (4) Goodsill's post-complaint communications with the ODC; and (5) any mention of Goodsill's deliberations and investigation insofar as they relate to the ODC. Goodsill argued before the trial court that "[s]uch evidence is immune from suit under RSCH Rule 2.8, and confidential under RSCH Rule 2.22 (2007)." Goodsill further argued that "[s]uch evidence is not relevant to [Kamaka's] claims, excluding those claims that are barred by [RSCH] Rule 2.8 immunity." Finally, Goodsill argued that, even if such evidence were relevant, HRE Rule 403 precluded evidence of Goodsill's communications and actions related to the ODC.

As previously stated, Kamaka, in response, argued that RSCH Rule 2.8 "does not create

an evidentiary privilege that would preclude the complaint or the testimony from being admitted in evidence if relevant to a properly asserted claim." Kamaka asserted that the "ODC complaint and the related materials are relevant to the causes of action for defamation, breach of contract, civil rights violation, and infliction of emotional distress, inasmuch as they tend to establish Goodsill['s] ... state of mind, motive, plan, intent, and knowledge when it engaged in the wrongful acts that give rise to its liability to Plaintiff."

On July 15, 2002, the trial court entered an order granting in part and reserving ruling in part on Goodsill's May 3, 2002 motion in limine. Therein, the trial court granted Goodsill's motion as it pertained "to the meeting between Goodsill representatives and [former Chief Disciplinary Counsel] Laureen Wong of the [ODC] on December 19, 1995, post-complaint communications with the [ODC], and the [ODC's] ultimate finding with respect to the complaint about Kitty K. Kamaka."

Kamaka now argues that the trial court erred in excluding from evidence "all reference whatsoever to the ODC episode." Kamaka specifically contends that RSCH "Rule 2.8 contains no *evidentiary* privilege, nor is there any other privilege, which excludes evidence otherwise relevant to other causes of action." (Emphasis in original.) In response, Goodsill argues that "the trial court readily understood that Kamaka's purpose in seeking admission of ODC-related evidence at trial was to evade the absolute privilege of Rule 2.8." Goodsill further contends that the trial court properly excluded the evidence

pursuant to HRE Rule 403 (governing the exclusion of evidence due to prejudice).

### 1. RSCH Rule 2.8

 Kamaka has not identified the specific evidence which she claims the trial court improperly excluded. She has, however, identified the trial court's July 15, 2002 order in her statement of points of error. Therefore, we consider Kamaka's argument only to the extent that it pertains to the evidence excluded pursuant to the July 15, 2002 order.[23]

 As an initial matter, we disagree with Kamaka's assertion that RSCH Rule 2.8, which states that *"[c]omplaints* submitted to the [ODC] or *testimony given with respect thereto* .... shall be absolutely privileged and no lawsuit predicated thereon may be instituted[,]"* (emphases added), does not include an evidentiary privilege. A complaint for purposes of Rule 2.8 is a communication made to the disciplinary counsel alleging attorney misconduct. *See* RSCH 2.6(2) (1996) (establishing the power and duty of disciplinary counsel to "investigate all matters involving alleged misconduct called to his or her attention whether by complaint or otherwise"). The term "testimony" generally refers to statements made under oath. *See, e.g.*, Black's Law Dictionary 1515 (8th ed.2004) (**"testimony,** *n.* Evidence that a competent witness under oath or affirmation gives at trial or in an affidavit or deposition").

 With regards to the specific evidence excluded by the trial court pursuant to its July 15, 2002 order, Kamaka has failed to comply with HRAP Rule 28(b)(4).[24] Because

23. It should be noted that Kamaka has not pointed to anywhere in the record where the trial court excluded (1) Goodsill's complaint to the ODC, (2) pre-complaint communications between Goodsill and the ODC, (3) pre-complaint notes, drafts, and reports that involved, discussed, or led to Goodsill's communications with the ODC, or (4) Goodsill's deliberations and investigations relating to the ODC complaint. In fact, it appears from the July 15, 2002 order that the trial court reserved ruling on all four of these issues. Therefore, Kamaka's allegation that the trial court "excluded from evidence all reference whatsoever to the ODC episode" is duplicitous. Furthermore, "[t]his court is not obligated to sift through the voluminous record to verify an ap-

pellant's inadequately documented contentions." *In re Guardianship of Carlsmith*, 113 Hawai'i 211, 234–35, 151 P.3d 692, 715–16 (2007) (quoting *Lanai Co. v. Land Use Comm'n*, 105 Hawai'i 296, 309 n. 31, 97 P.3d 372, 385 n. 31 (2004)).

24. HRAP Rule 28 provides in relevant part:

(b) Opening brief. Within 40 days after the filing of the record on appeal, the appellant shall file an opening brief, containing ...
(4) A concise statement of the points of error set forth in separately numbered paragraphs....
(A) when the point involves the admission or rejection of evidence, a quotation of the

Kamaka has not included "a quotation of the grounds urged for the objection and *the full substance of the evidence ... rejected,*" it is impossible to discern whether certain evidence qualified as complaint or testimony under Rule 2.8, whether the evidence may have been properly excluded on other grounds, or whether the evidence was erroneously excluded. Therefore, we disregard Kamaka's arguments with respect to the December 19, 1995 meeting between Goodsill representatives and former Chief Disciplinary Counsel Wong.

In her supplemental memorandum in opposition to Goodsill's motion, Kamaka identified and attached three exhibits that she alleged were relevant "post-complaint" communications between Goodsill and the ODC. Those exhibits included (1) a May 7, 1996 memorandum from the ODC to Petrus requesting Larry Song's [25] conclusions from his investigation [hereinafter, the request letter],[26] (2) a July 2, 1996 *draft* response to the ODC by Goodsill partner Carl Schlack, and (3) a July 5, 1996 response letter to the ODC. Kamaka also identified and attached a March 31, 1997 letter from the ODC to Kamaka indicating the ODC's ultimate conclusion [hereinafter, the dismissal letter].[27]

> grounds urged for the objection and the full substance of the evidence admitted or rejected.
>
> ....
>
> Points not presented in accordance with this section will be disregarded[.]

**25.** As previously stated, per request of David Reber of Goodsill's Management Committee, Larry Song conducted a review of several matters worked on by Kamaka to determine whether adjustments should be made to client billings.

**26.** The request letter provided in part:

> Dear Ms. Petrus:
> This letter is to inform you that I have been assigned to investigate the allegations made to our office.
> Please provide me with copies of the time sheets of work performed by Ms. Kamaka and the billing statements sent to the clients for *Palcol v. Prudential* and *Mohamed v. Hawai'i Pathologists' Laboratory, et al.,* copy of the audit performed and conclusion by Mr. Song on Ms. Kamaka's cases, and the review of the findings of your firm's investigation into this matter as well as the opportunity given Ms. Kamaka to provide her response.

First, with regards to the three "post complaint" communications, clearly, because all three memoranda were written communications that were not made under oath, they were not "testimony." However, the request letter appears to have referenced allegations that had previously been made by Petrus to the ODC with respect to Kamaka's work on two specific cases mentioned therein and Goodsill's findings with respect to its internal investigation. Pursuant to the request letter, the ODC sought further information with respect to Petrus' prior allegations. In her supplemental memorandum in opposition to Goodsill's motion, Kamaka identified and attached three exhibits that she alleged were relevant "post-complaint" communications between Goodsill and the ODC.

■ With respect to the dismissal letter, although the letter identified Petrus as the "[c]omplainant" and that the ODC had conducted an investigation into alleged "attorney misconduct," it did not identify any specific statement or communication made by Petrus to the ODC alleging attorney misconduct. Therefore, RSCH Rule 2.8 did not preclude admission of the dismissal letter as evidence. The inquiry, however, does not end here.

> I would also like to schedule a time where I can review the case files of the cases mentioned above.

**27.** The dismissal letter from the ODC to Kamaka provided in part:

> Re: ODC 4919
> Barbara A. Petrus, Complainant
> Dear Ms. Kamaka:
> As you are aware, the above-referenced ethics matter has been investigated by our office. Our investigation has included a thorough review of the information submitted by both you and Ms. Petrus, as well as other information. The Rules of the Supreme Court of Hawai'i require that any finding of attorney misconduct be supported by "clear and convincing evidence." In this case, it has been determined that there is insufficient evidence to clearly support a finding of a disciplinary violation on your part.
> This investigation has, in accordance with required procedure, been reviewed by a member of the Disciplinary Board, who has made this determination. Therefore, this complaint matter has been dismissed.
> Thank you for your patience during the pendency of this matter. This case is now closed.

### 2. HRE Rule 403

 Goodsill argues that the trial court properly excluded the ODC-related evidence, including the dismissal letter, pursuant to HRE Rule 403. Rule 403 provides that:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of *unfair prejudice,* confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

(Emphasis added.) "Unfair prejudice" is defined in the commentary as "an undue tendency to suggest decision on an improper basis[.]" HRE Rule 403 cmt. (quoting Fed. R.Evid. 403 advisory committee's note). Goodsill contends that "[t]he trial court recognized the very real danger that allowing reference to the 'ODC episode' might lead the jury to find liability, and award damages, for Goodsill's reporting of Kamaka to the ODC, a clearly improper basis."

Inasmuch as Kamaka offers no discernable argument with respect to the trial court's application of HRE Rule 403 pursuant to Goodsill's motion, no further consideration is needed as Kamaka has waived any remaining point of error. *See* HRAP Rule 28(b)(7) (stating that an opening brief should contain "[t]he argument, containing the contentions of the appellant on the points presented and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on.... Points not argued may be deemed waived"). Therefore, based on the foregoing, Kamaka has not met her burden of demonstrating error with respect to the trial court's exclusion of the dismissal letter. Accordingly, based on the foregoing, we hold that the trial court did not abuse its discretion in granting Goodsill's motion in limine.

### F. *Judgment Notwithstanding the Verdict*

In its January 9, 2003 renewed motion for judgment as a matter of law, Goodsill alerted the trial court to this court's decision in *Gonsalves v. Nissan Motor Corp.,* 100 Hawai'i 149, 58 P.3d 1196 (2002). The *Gonsalves* decision was issued on November 27, 2002, over four months after the jury entered its verdict in favor of Kamaka on her claim for breach of the employee manual. Goodsill asked that the trial court,

[w]ith the assistance of the recent *Gonsalves* decision[,] ... enter judgment as a matter of law, in its favor notwithstanding the jury's verdict on [Kamaka]'s breach of contract claim because (1) the [manual] contains no specific promises by Goodsill which could provide a legal basis for [Kamaka]'s breach of contract or damages claims, and (2) public policy precludes enforcement of any promise not to terminate [Kamaka] after Goodsill came to believe that she had falsely recorded time for work she had not performed.

Goodsill further argued that: (1) the manual contained a clear and conspicuous disclaimer and, therefore, did not unfairly induce Kamaka's reliance on other statements made therein; (2) Goodsill did not breach any alleged promise; and (3) Kamaka failed to prove causation between the alleged breach and the damages.

On October 9, 2003, the trial court granted Goodsill's renewed motion for judgment as a matter of law, thereby reversing the jury's verdict and award of $209,937.91 in favor of Kamaka. The trial court's order identified three grounds for its decision: (1) "[t]here is no credible evidence to support a finding that [Goodsill] made a promise that it would use a specific process or procedure in a specific situation or that [Goodsill] failed to follow the promised process or procedure in the situation in which it was promised[;]" (2) "any promise that [Goodsill] could not terminate [Kamaka] unless certain promises and procedures were met, even if [Goodsill] determined that [Kamaka] fraudulently recorded time, would not be enforceable as against public policy in accordance with holdings in *Gonsalves v. Nissan Motor*[;]" and (3) "[Kamaka] failed to prove causation between any alleged breach of a promise by [Goodsill] and [Kamaka]'s damages." The trial court concluded as follows:

THEREFORE, upon review and consideration of the [r]enewed [m]otion, the Hawai'i Supreme Court decision in *Gonsalves*[,] ... evidence presented at trial, and oral argument of counsel, the [trial c]ourt finds and concludes that there is no

evidence to support the verdict of the jury as to [Kamaka's] breach of [manual] claim.

Kamaka argues that a renewed motion for judgment as a matter of law may not assert a ground not asserted in the original motion for judgment as a matter of law. Specifically, Kamaka contends that "Goodsill did not argue that the promises alleged by [her] were unenforceable on public policy grounds, that [Kamaka's] at-will status was unchanged, that the [manual] did not induce reliance, *or that no damages were caused by the breach.*" (Emphasis in original.) Therefore, Kamaka submits that Goodsill waived these issues and was precluded as a matter of law from asserting them in the renewed motion. Consequently, Kamaka asserts that the trial court was precluded from granting the renewed motion on those grounds.

We agree that, generally, a renewed motion for judgment as a matter of law cannot assert a ground that was not included in the original motion. *Stewart v. Brennan*, 7 Haw.App. 136, 141, 748 P.2d 816, 820 (1988); *see also Shishido v. State*, 4 Haw.App. 321, 324, 666 P.2d 608, 611 (1983) (providing that a renewed motion for judgment as a matter of law is only a renewal of an earlier motion and cannot assert additional grounds); *Lovell Enters. v. Campbell-Burns Wood Prods.*, 3 Haw.App. 531, 540, 654 P.2d 1361, 1367 (1982) (same); *Cabral v. McBryde Sugar Co.*, 3 Haw.App. 223, 647 P.2d 1232 (1982) (same). The original motion for judgment as a matter of law must "specify the judgment sought and the law and the facts on which the moving party is entitled to judgment," HRCP 50(a), and must be precise to the extent necessary to "apprise the court of the movant's position and to preclude the later granting of a [renewed] motion for [judgment as a matter of law] on a ground that could have been met with proof if it had been stated in the [original] motion[.]" *Shishido*, 4 Haw.App. at 324, 666 P.2d at 611 (citations omitted). The renewed motion "may not enlarge the matters presented in the [original] motion[.]" *Id.* Reliance "on lack of proof of one essential element in the [original] motion ... and of another element in the [renewed] motion ... is contrary to the purpose of the rule[.]" *Id.* at 325, 666

P.2d at 611. Likewise, a court's entry of judgment notwithstanding the verdict based on an element not argued in the original motion is improper. *Id.* at 325, 666 P.2d at 612.

Pursuant to its original motion for judgment as a matter of law, Goodsill argued solely "that there is nothing contained within [the manual] which could reasonably be construed to constitute a *promise* by Goodsill that it would only terminate an employee after certain specified procedures were followed." (Emphasis in original.) Goodsill's subsequent assertion, in its renewed motion, of a public policy preclusion pursuant to *Gonsalves*, and its arguments asserting lack of proof regarding the elements of reliance, breach, and causation, enlarged the question presented in the original motion. However, the assertion of additional grounds not previously asserted in the original motion for judgment as a matter of law that are based upon a subsequent judicial decision is not necessarily fatal inasmuch as "judicial decisions are assumed to apply retroactively, [but] not automatic[ally]." *Catron v. Tokio Marine Management, Inc.*, 90 Hawai'i 407, 411, 978 P.2d 845, 849 (1999). Moreover,

> where substantial prejudice results from the retrospective application of new legal principles to a given set of facts, the inequity may be avoided by giving the guiding principles prospective application only.

*State v. Ikezawa*, 75 Haw. 210, 214–15, 857 P.2d 593, 597–98 (1993) (footnote omitted).

In *Ikezawa*, we held that, because the defendant in that case had relied on clear precedent, a subsequent case overruling that precedent would not be applied retroactively. Retroactive application of the subsequent case in *Ikezawa* would have resulted in clear prejudice to the defendant. Distinguishing *Ikezawa* [ ] in *State v. Okuno*, 81 Hawai'i 226, 229, 915 P.2d 700, 703 [ (1996) ], we applied a judicial decision retroactively because

> Okuno ha[d] failed to show how he [was] substantially prejudiced by the retrospective application of the court's interpretation of HRS § 286–162(d) in *State*

**118**

*v. Toyomura,* 80 Hawai'i 8, 904 P.2d 893 (1995). This court was afforded its first opportunity, in *Toyomura,* to interpret section 286–162(d); thus, there [was] no previous precedent upon which Okuno could have relied. Retrospective application of *Toyomura* to cases pending when it was decided satisfies the requirements enunciated in *Ikezawa.*

State v. Opupele, 88 Hawai'i 433, 440, 967 P.2d 265, 272 (1998) (brackets and ellipses in original) (some brackets omitted).

*Id.* at 411–12, 978 P.2d at 849–50 (some brackets in original and some added). In other words, if a clear precedent for the proposition that Goodsill raised in its renewed motion had existed at the time of its original motion, Goodsill's attempt to raise such proposition based on *Gonsalves* would have been—as Kamaka asserts here—prohibited. However, if *Gonsalves* announced a new legal principle, Goodsill's reliance thereon—and the retrospective application thereof—would have been appropriate, unless such application prejudiced Kamaka. *Id.* We need not, however, resolve the propriety of Goodsill's and the trial court's reliance on *Gonsalves* inasmuch as the question regarding the existence of a requisite promise—which was raised by Goodsill in *its* original motion *and* its renewed motion for judgment as a matter of law—is dispositive.

▮▮▮▮ As previously stated, Goodsill maintained in its renewed motion for judgment as a matter of law that Kamaka failed to prove at trial the existence of the requisite promise within the body of the employee manual. This court has previously held that, "in the absence of a written employment agreement, a collective bargaining agreement, or a statutorily-conferred right, employment is at-will." *Shoppe v. Gucci America, Inc.,* 94 Hawai'i 368, 383, 14 P.3d 1049, 1064 (2000). The right of an employer to terminate an at-will employee "can be contractually modified and, thus, qualified by statements contained in employee policy manuals or handbooks issued by employers to their employees." *Id.* at 368, 14 P.3d at 1064 (quoting *Kinoshita v. Pacific Airlines,* 68 Haw. 594, 601, 724 P.2d 110, 115–16 (1986)). In fact, "if an employer issues policy statements or rules, in a manual or otherwise, and, by its language or by the employer's actions, encourages reliance thereon, the employer cannot be free to only selectively abide by it." *Shoppe,* 94 Hawai'i at 385, 14 P.3d at 1066 (citation omitted). For example, in *Kinoshita,* this court considered whether Canadian Pacific Airline's (CPA) employee rules, which had been distributed to its employees, constituted a contract enforceable by the employees. 68 Haw. at 596, 724 P.2d at 113. The CPA employee rules provided in part:

27.04 No permanent employee will be disciplined or discharged until his case first has been investigated. The decision in such cases to be reached within ten (10) calendar days from the date of suspension.

27.05 No employee may be held out of service without pay pending investigation for more than seven (7) work days. . . .

27.06 If, as a result of any hearing or appeal therefrom, as provided herein an employee is exonerated, who has been held out of service, he shall be reinstated without loss of seniority, and shall be paid for such time lost in an amount that he would have earned as regular salary had he continued to be in service during that period.

*Id.* at 598, 724 P.2d at 114. The following year, CPA issued a letter to each employee, which stated in part that "our written employment arrangements with you . . . constitute an enforceable contract between us under the labor law of the state in which you work. Thus your rights in your employment arrangement are guaranteed." *Id.* at 598, 724 P.2d at 114 (brackets omitted). Where the employee rules promised "specific treatment in specific situations" and CPA encouraged employees to rely on its employee rules, this court held that such rules amounted to a contract enforceable by the employees. *Id.* at 603, 724 P.2d at 117–18.

In *Shoppe,* the plaintiff was terminated from her position with Gucci America, Inc. 94 Hawai'i at 376, 14 P.3d at 1057. The plaintiff filed a complaint in circuit court alleging, *inter alia,* breach of employment contract based on Gucci's employee handbook. *Id.* Gucci's employee handbook provided in part:

On some occasions when your performance does not meet Gucci standards, you may be given a verbal warning by your supervisor or manager. Two or more such verbal warnings will result in a written Incident Report which will be discussed with you by your supervisor and become a permanent part of your employee file. The written Incident Report may also result without prior verbal warnings, if in the opinion of your supervisor or manager, your conduct warrants such action. Serious discipline including suspension or termination, may result if: 1) in your supervisor's or manager's opinions such discipline is warranted or, 2) you have received two or more written Incident Reports within a calendar year.

While your employment with Gucci may be terminated without cause by Gucci or by you, the following represent some of the conduct which could result in serious disciplinary action up to and including termination: . . . excessive absence or lateness and unexcused lateness or absence . . . and below standard job performance.

*Id.* at 385, 14 P.3d at 1066 (internal brackets omitted). The plaintiff appealed to this court after the circuit court granted summary judgment in favor of Gucci. *Id.* at 376, 14 P.3d at 1057.

On appeal, this court observed that

Gucci's employee handbook does not require a written warning before termination. The handbook provision makes it plain that termination is not predicated exclusively upon receipt of two or more written incident reports. An employee may be terminated without receiving a written report if, in the estimation her supervisor, "such discipline is warranted."

*Id.* at 385, 14 P.3d at 1066. Thus, this court held that "Gucci's employee handbook [did not give] rise to the possibility of contractual

recovery. Because Gucci's handbook *did not modify its right to discharge employees,* the circuit court correctly granted summary judgment in favor of Gucci." *Id.* at 386, 14 P.3d at 1067 (emphasis added).

 In the present case, Kamaka asserts that the manual contained "specific procedures and standards that Goodsill was obligated to follow." Specifically, Kamaka asserts that she relied on provisions contained in Appendix H of the manual, as well as the manual's "promises of specific procedures to be followed by the [ADC] with regard to the evaluation process." Kamaka's arguments are unavailing. The promises asserted by Kamaka are not of the type that this court has recognized as sufficient to alter an at-will employment relationship.[28]

Appendix H of the manual, entitled "Recording and Charging Time Policy Practice and Procedure," states in relevant part:

*Policy*

1. The Billing Partner (BP) has responsibility for the form of bills sent to clients and for what appears on client bills.

2. The BP is authorized to write off time/costs or to discount rates, subject to Management Committee approval if the write-off exceeds certain limits.

3. Associates and legal assistants are responsible for timely and accurate recording of all the time they spend on a matter. Even if they feel that time spent was not productive or should not be billed for other reasons, they should record the time. The BP is responsible to decide whether it will be billed.

*Practice*

. . . .

6. You should not destroy your time records (i.e. your personal notes) because they may be a valuable source of infor-

---

**28.** In her memorandum in opposition to Goodsill's motion for attorneys' fees and costs, Kamaka indicated that, pursuant to her claim for breach of handbook and manual, "[t]he requested relief was based upon breach of an implied promise of fair treatment, an *independent duty implied by law*[.]" (Emphasis in original.) This court has never recognized an "implied promise of fair treatment" as a means for altering the at-

will status of an employment relationship. In fact, this court has been unwilling for many years "to imply into each employment contract a duty to terminate in good faith[.]" *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 377, 652 P.2d 625, 629 (1982). "[P]rotection of employees [does not] require[ ] such an intrusion on the employment relationship or such an imposition on the courts." *Id.*

mation in the event of disputes, charges of malpractice, etc.

....

*Procedures*

....

3. Normally the "meter starts to run" from the moment you pick up a matter to the moment you put it down again. Thus, billable time includes the time spent on travel, etc.

....

*If in doubt, charge the time. It is the BP who will decide whether it should be billed.*

....

2. Our standard time recording unit is fifteen minutes.... In general, you should "round upwards" so that anything between zero and 15 minutes should be recorded as 15 minutes. This rounding should not be abused, however.... *If in doubt, record the time.* The BP can write off time recorded, but can never capture billings for valuable time not recorded.

(Emphases in original.)

Page three of the manual discussed the functions of the ADC as follows:

The [ADC] ... oversees the development of associates at the firm. It is comprised of six partner members, three associate members (two from Honolulu and one from Kona), and the Managing Director.

The primary duties of the ADC are (1) to administer associate evaluations; (2) to serve as a sounding board for associate concerns; (3) to oversee the professional development of associates; (4) to oversee the assignment of associates to supervising partners; and (5) to make recommendations as to associates coming up for partnership.

If you have a question about the firm, you should always feel free to talk to one of the ADC associates. If the ADC associate does not know the answer, he or she will find out the answer and get back to you.

Likewise, if a problem arises at work which you are not able to resolve, you can talk to one of the ADC associates or partners. He or she will try to help you get the situation resolved either through the ADC or through some other means.

Page eleven of the manual discussed the associate evaluation process as follows:

As an associate, you will be evaluated once a year shortly after your anniversary date with the firm.

The evaluation is based on written evaluations forms that are sent to some or all of the partners in the firm. During odd-number year evaluations (*e.g.,* first year, third year), you are evaluated by only those partners for whom you have done work during the past year. During your even-number year evaluations (*e.g.,* second year, fourth year), you are evaluated by all of the partners.

A few days before your evaluation, your supervising partner will sit down with you and let you know generally what the evaluation forms said (however your supervising partner will not show you the forms themselves).

The evaluation itself is administered by two ADC partners and has three stages. The ADC partners talk with your supervising partner alone first, then with both you and your supervising partner, and finally with you alone.

Nothing in the text of appendix H suggests that, as long as an employee complies with the time recording procedures stated therein, the employee cannot be terminated at-will. In fact, page one of the manual expressly provides that:

The [manual] is intended as an informal guide to the workings of the firm. It was created by and has been maintained by the associate members of the [ADC]. Therefore, *it is not an official statement of firm policy* (with the exception of Appendices B, C, F, and I attached to the [manual[29]]). It simply tells you how things are general-

29. Appendices B, C, F, and I relate to: (1) "Billable Hours Policy" (Appendix B); (2) "GAQS Associates' Housing Loan Program" for first-time homeowners (Appendix C); (3) "Goodsill Anderson Quinn & Stifel Certain Guidelines for Partnership Consideration" (Appendix F); and (4) "Vacation Policy for Full–Time Attorneys (other than equity partners)" (Appendix I).

ly done around here. You should also keep in mind that some of the policies and practices described in the [manual] and its appendices may change over time. The most recent updates to the [manual] were made in September 1993.

(Emphasis added.) Moreover, inasmuch as the manual described the functions of the ADC and the associate evaluation process, nothing within the text of the manual could be construed as a specific procedure that Goodsill promised to follow for termination or as otherwise altering Goodsill's right to terminate Kamaka for any reason or no reason. Regardless of whether the manual contained specific procedures and provisions that Kamaka relied on, or impliedly promised fair treatment regarding the associate evaluation process, the ADC, and the time recording practices, nothing within the text of the manual can be construed to modify Goodsill's right to discharge employees at-will.

Even when viewing the evidence in the light most favorable to Kamaka—in particular, those parts of the manual discussed *supra*—such evidence could not support a finding that the manual contained a specific termination procedure thereby altering Kamaka's at-will status. Thus, we hold that the trial court did not commit error by granting Goodsill's renewed motion.

### G. *Attorneys' Fees and Costs*

By order filed on December 24, 2003, the trial court awarded Goodsill its requested fees, in full, *i.e.*, $364,154.25, but reduced the award of costs to $64,865.24.

 Kamaka's final contention is that "the [trial] court's grant of Goodsill's motion for attorneys' fees and costs was erroneous, arbitrary and capricious, and an abuse of discretion." [30] (Capital lettering altered.)

Normally, pursuant to the "American Rule," each party is responsible for paying for his or her own litigation expenses. This general rule, however, is subject to a number of exceptions: attorney's fees are chargeable against the opposing party when so authorized by statute, rule of court, agreement, stipulation, or precedent. *Lee v. Aiu*, 85 Hawai'i 19, 32, 936 P.2d 655, 668 (1997) (citations omitted).

*808 Development, LLC v. Murakami*, 111 Hawai'i 349, 363, 141 P.3d 996, 1010 (2006). Goodsill asserts that it is entitled to an award of attorneys' fees pursuant to HRS § 607–14 as the prevailing party. HRS § 607–14 provides in pertinent part:

> **Attorney's fees in actions in the nature of assumpsit, etc.** In all the courts, in all actions in the nature of assumpsit and in all actions on a promissory note or other contract in writing that provides for an attorney's fee, there shall be taxed as attorneys' fees, to be paid by the losing party and to be included in the sum for which execution may issue, a fee that the court determines to be reasonable; provided that the attorney representing the prevailing party shall submit to the court an affidavit stating the amount of time the attorney spent on the action and the amount of time the attorney is likely to spend to obtain a final written judgment, or, if the fee is not based on an hourly rate, the amount of the agreed upon fee. The court shall then tax attorneys' fees, which the court determines to be reasonable, to be paid by the losing party; provided that this amount shall not exceed twenty-five per cent of the judgment.

(Emphasis in original.) In discussing whether a claim is "in the nature of assumpsit" under HRS § 607–14, this court has stated:

> "[A]ssumpsit" is "a common law form of action which allows for the recovery of damages for non-performance of a contract, either express or implied, written or

---

**30.** Goodsill requested costs pursuant to HRS § 607–9 (1993). Based on Goodsill's itemized list of costs submitted to the trial court with its motion for fees and costs, the $216.24 reduction appears to result from a disallowance of long distance telephone costs. It should be noted that, although Kamaka styles her point of error as including a dispute over costs, she presents no specific argument as to why the costs that the trial court approved were incorrect. In challenging the award of fees, Kamaka phrases her challenge as being related to "fees and costs"; however, she proceeds to address only fees—not costs. Consequently, because Kamaka makes no specific argument as to costs, our analysis focuses only on attorneys' fees. *See* HRAP Rule 28(b)(7) (points not argued may be deemed waived).

verbal, as well as quasi contractual obligations." *Schulz v. Honsador,* 67 Haw. 433, 435, 690 P.2d 279, 281 (1984) (emphasis added). In deciding whether to award fees under HRS § 607–14, the court must determine the nature of the lawsuit where both assumpsit and non-assumpsit claims are asserted in an action. *Id.* at 436, 690 P.2d at 282 (citation omitted).

*Blair v. Ing,* 96 Hawai'i 327, 332, 31 P.3d 184, 189 (2001) (footnote omitted). This court has held that, for purposes of HRS § 607–14, the party in whose favor judgment was entered is the prevailing party. *Id.* at 330–31, 31 P.3d at 187–88.

Kamaka essentially contends that the trial court's award of attorneys' fees was an abuse of discretion because: (1) Goodsill's motion for fees was not supported with adequate documentation; (2) the trial court failed to make required findings of fact; (3) the trial court incorrectly and unfairly calculated the award; and (4) the "balance of the equities" argue against Goodsill being declared the prevailing party for purposes of HRS § 607–14 or receiving its requested fees. We address each contention in turn.

### 1. Inadequate Documentation

Kamaka contends that Goodsill did not support its motion for attorneys' fees with adequate documentation.[31] Kamaka asserts that:

> Without an adequate record, an award of fees cannot stand. *See Sharp v. Hui Wahine, Inc.,* 49 Haw. 241, 249[250], 413 P.2d 242, 251[249] (1966) (setting aside an award because the record was inadequate and did not "enable the trial judge to exercise his discretion in determining 'reasonable' attorneys' fees.").
>
> In this case, there was not a complete record of *all* the attorneys' fees claimed to have been charged, including Goodsill's own time. Without a full picture of what work was done by the whole team of lawyers, what lawyers did what work at what rates[,] for what reason, and produced what value [sic], the [trial] court could not

conclude that Goodsill's self[-]selected partial vignette shows that the fees claimed were reasonable, not duplicative, excessive or improper.

(Emphasis in original.) Initially, Goodsill states that Kamaka failed to make the transcript of the hearing on Goodsill's motion for fees and costs part of the record and, therefore, "this [p]oint of [e]rror should be disregarded outright." Goodsill continues:

> In addition, Goodsill's moving papers sufficiently supported the award of attorneys' fees. It submitted the bills of [Goodsill's attorneys, Dane L.] Miller and [Wilma] Sur [of the law firm of Miller, Tokuyama and Sur, LLP [hereinafter, the Miller law firm]] and the sworn statement that Goodsill's [own] attorneys' fees amounted to more than double the amount of $365,154.25. Goodsill also based its request for attorneys' fees and costs on, *inter alia,* the six years of litigation involved in the case, almost entirely before the same trial court judge who granted attorneys' fees in Goodsill's favor, the number of claims brought against Goodsill by [Kamaka] including numerous claims sought to be added to the complaint but that were denied, the number of dispositive and other motions filed, the several weeks of trial, and post-verdict motions.

(Citation to the record citation omitted.) Goodsill also questions Kamaka's use of the *Sharp* decision and distinguishes the facts of that case from those at bar.

Neither *Sharp* nor any other case sets a bright line standard for adequacy of documentation in the trial court's determination of attorneys' fees. Rather, as previously stated, a trial court's award of attorneys' fees is reviewed for an abuse of discretion which occurs when the trial court clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant. *Zanakis–Pico v. Cutter Dodge, Inc.,* 98 Hawai'i 309, 315, 47 P.3d 1222, 1228 (2002). Thus, the question is whether the trial court's award of

---

31. Kamaka also suggests that the documentation was duplicative and failed to show grounds for apportionment between assumpsit and non-as- sumpsit claims. These assertions are discussed, *infra,* as part Kamaka's contention that the award was incorrectly and unfairly calculated.

attorneys' fees and costs was reasonably supported by the record. Here, Goodsill's motion and memorandum in support, along with its "Table of Costs" and eighteen exhibits, consumes over 400 pages and documents or attests to over $800,000 in attorneys' fees. Exhibit "G" to Goodsill's motion consists of over 140 pages of detailed billing statements from the Miller law firm, amounting to $406,059.38. In addition, Goodsill's memorandum in support of its motion and the declaration of Emily Reber Porter, an associate at the Goodsill firm, attached to the motion indicates that, "[w]hen the fees of Goodsill's other lead counsel, David J. Dezzani, and additional counsel are included, the total amount of fees exceed [$800,000.00]." Based on the record before the trial court, we cannot say that its award of fees was made without adequate documentation. Accordingly, we believe Kamaka's assertion to the contrary is without merit.

### 2. Trial Court's Failure to Make Necessary Findings

■ Kamaka next contends that the trial court failed to make necessary findings of fact.

In [the order denying Kamaka's motion for attorneys' fees and costs as moot,] the [c]ircuit [c]ourt concluded that if it were to rule on the motion it would have reduced the $820,712.00 in fees and $99,103.81 in costs by 90 [percent], to fees $52,484.48 and costs of $42,246.54.... [The trial] court made specific findings related to Kamaka's costs in 23 numbered paragraphs. Such findings were *completely absent* from the [trial] court's award to Goodsill. Thus, how the court apportioned (if it did), why it was inconsistent with its findings as to Kamaka's fees (see below), how it treated the costs items, or *any reasoning* to support its findings, make its decision unreviewable and[,] on that ground alone, reversible.

(Emphases in original.) (Footnote and citation to the record omitted.) However, Kamaka cites no authority for the proposition that a trial court must make findings of fact in support of its grant of attorneys' fees. In fact, where attorneys' fees and costs are

supported by the record, no specific findings of fact by the granting court are required, especially where, as here, the fees were granted in whole. *Cf. Stanford Carr Dev. Corp. v. Unity House, Inc.*, 111 Hawai'i 286, 306, 141 P.3d 459, 479 (2006) (circuit court did not abuse its discretion in awarding attorneys' fees and costs where the prevailing party had provided sufficient authentication and documentation in its motion for costs and fees). Inasmuch as the record before this court is sufficient to allow review and, as discussed *infra*, such a review provides ample justification for the trial court's award of attorneys' fees, Kamaka's assertion that findings of fact were required is without support.

### 3. Calculation by the Trial Court

■ Kamaka contends that the trial court incorrectly and unfairly calculated the amount of attorneys' fees and costs. Kamaka asserts that:

While the court found that fees based on 25[ percent] of the jury verdict of $209,937.92, was reasonable for Kamaka, it awarded fees to Goodsill based on 25[ percent] of $1,456,617.00, despite the fact that both awards were made pursuant to the same statute for the same case. That the court used one method of computation for Kamaka and another for Goodsill shows that an abuse of discretion [sic] in accepting Goodsill's request wholesale without any findings.

Goodsill retorts that Kamaka

The [trial] court [used different methods] because *that is precisely what HRS § 607–14 requires.*

HRS § 607–14 sets forth *different* bases for calculating fees *depending upon whether the plaintiff or the defendant prevails;* "The above fees provided for by this section shall be assessed on the *amount of the judgment* exclusive of costs and all attorneys' fees obtained by the *plaintiff,* and upon the *amount sued for if the defendant* obtains judgment." (Emphasis added.) In this case, Goodsill, the [d]efendant, prevailed, thus Goodsill was entitled to "the amount sued for" by Kamaka.

(Emphases and some bracketed information in answering brief.) The pertinent language from HRS § 607–14, accurately quoted (with added emphases) by Goodsill, states that attorneys' fees "provided for by this section shall be assessed on the amount of the judgment exclusive of costs and all attorneys' fees obtained by the plaintiff, and upon the amount sued for if the defendant obtains judgment." Based on the plain language of the statute and, because the amount the jury awarded Kamaka differed from the amount sued for, it follows that the amount of attorneys' fees awarded would vary when the prevailing party changed from plaintiff-Kamaka to defendant-Goodsill. Thus, contrary to Kamaka's assertion that the trial court's calculations were based on an unfair method of computation, the trial court's method of calculating fees was, in fact, dictated by the mandates of HRS § 607–14. *See Stanford Carr Dev. Corp. v. Unity House, Inc.,* 111 Hawai'i 286, 307, 141 P.3d 459, 480 (2006) (holding award of fees in favor of defendant based upon twenty-five percent of damages alleged by plaintiff to be within the statutory limitation).

■ Kamaka also essentially contends that the trial court failed to make an apportionment between assumpsit and non-assumpsit claims, thereby rendering its award of fees "unreviewable" and, thus, "reversible." Kamaka argues that

[t]he [trial] court's computation was apparently based on the incorrect assumption that Kamaka's entire action was an assumpsit claim for $1,456,617.00. (25[ percent] of [$]1,456,617.00 equals the award of $364.154.25). When it awarded only $52,484.48 to Kamaka, the court made a finding that the *"primary claims"* were in discrimination and emotional distress—

32. The trial court, in its order denying Kamaka's motion for fees and costs, filed October 9, 2003, stated that, were it to rule on her motion, it would have ruled, in part, as follows:

[Kamaka] brought both assumpsit and non-assumpsit claims in this action. [Kamaka] prevailed on her claim for breach of contract, which is an assumpsit claim. In accordance with [HRS] § 607–14, the [c]ourt awards [Kamaka] attorney's fees in the amount of

non-assumpsit claims, and denying substantially all of her fees as a result. [32]

(Emphasis in original.) (Footnote omitted.)

The issue of apportionment between assumpsit and non-assumpsit claims was clearly before the trial court. However, the trial court made no statement as to the grounds for its award of fees to Goodsill nor any statement with respect to the apportionment issue. Nevertheless, it is apparent that the trial court adopted the reasoning put forth in Goodsill's motion inasmuch as it awarded the exact amount of attorneys' fees Goodsill had requested. In its memorandum in support of its motion, Goodsill argued (as it basically does on appeal):

The best measure of "the amount sued for" in this case, therefore, is the very amount that [Kamaka] requested the jury to award her for [the breach of contract] claim during closing arguments at the end of the trial. In her closing argument, [Kamaka]'s counsel argued for an award of $1,456[,]617 in lost wages for [Kamaka]'s breach of contract claim. [Kamaka's counsel] proposed, as a "conservative" estimate, that the jury award [Kamaka] "back pay for the previous six years" of $181,617, and "front pay" at the rate of $51,000 per year for the next 25 years, or $1,275,000. in total, therefore, [Kamaka's counsel] requested $1,456[,]617 for [Kamaka]'s breach of contract claim based upon the [manual]. Specifically, [Kamaka]'s counsel argued [during closing argument at trial]:

I want to just talk about lost pay for a minute and you've seen this before, it's Exhibit 147 which shows **backpay for the previous six years,** this is the historic data. And when you get a chance you'll be able to review it and compare the difference. And the arithmetic, if you add it up at the bottom, comes up to **$181,617.00** for the period before now.

$52,484.48, which amount is equal to 25[ percent] of the jury verdict. This [c]ourt finds this amount to be reasonable.

The [c]ourt denies [Kamaka]'s request for pre-judgment interest and equitable fee shifting. [Kamaka] did not prevail on nine and one-half of her claims and did not prevail on her primary claims of discrimination and intentional infliction of emotional distress.

**There's front pay.** Now, [Kamaka] testified that she expects to work to the age of 62, which is common for women. That's 25 years left in her career. Those 25 years are on a very different career pattern, though, than the one she would have been on.

A solo practitioner doesn't represent big clients or do big cases, she takes whatever she can get. . . .

. . . But there is a substantial money differential between that career pattern and the one she had been on. And you could approach this different ways. You could, for example, **take the $51,000.00 which is the differential as of last year and say well, if this differential continued onward for the rest of the two-thirds of her career that still exists, you multiply that by 25 and you arrive at a number [of $1,275,000].**

You could also approach it by saying well, if there's a percentage increase along both the upper and lower track of, let's say, six percent, you will find that it comes out to be the same or very similar range of number. And that number, if you were to apply $51,000.00 against the next 25 years, comes to **a little over $1.2 million,** which would be what's called front pay going forward.

**Now, these are very conservative numbers. . . .**

. . . the prevailing party in an assumpsit claim is entitled to twenty-five percent of "the amount sued for." As applied to this case, twenty-five percent of the amount sued for as to the breach of contract claim, based upon the [manual], is twenty-five percent of $1,456,617 or $364,154.25.

Moreover, as previously indicated, Goodsill provided documentation supporting over $800,000 in attorneys' fees incurred defending against all twelve of Kamaka's claims for relief, but limited its fee request to one claim, *i.e.*, the assumpsit claim, the calculation of which was dictated by HRS § 607-14, as discussed above. In so doing, it was unnecessary for the trial court to apportion fees as between assumpsit and non-assumpsit claims.

### 4. "Balance of Equities"

Finally, Kamaka declares that the "balance of the equities" argue against Goodsill being declared the prevailing party for purposes of HRS § 607-14 or receiving its requested fees.

Kamaka urges that, equitably, Goodsill should not have been deemed the prevailing party for purposes of fee shifting, when Kamaka prevailed at trial. "[W]hen a jury finds for the plaintiff as to liability, the plaintiff is the prevailing party[.]" *MFD Partners v. Murphy*, 9 Haw.App. 509, 514, 850 P.2d 713, 716 [ (1992) ]. The [renewed motion for judgment as a matter of law] was granted mainly as the result of *Gonsalves*. To use a [renewed motion for judgment as a matter of law], itself based on retroactive application of a post-verdict case, to shift fees against the prevailing party at trial is inequitable.

In the balance of the equities, the [trial] court (and this [c]ourt) should consider Goodsill's abusive litigation conduct to deny or reduce its request to shift fees to Kamaka [sic], particularly considering Kamaka's small resources. . . . At least the [c]ourt should disallow Goodsill's fees . . . which related to the obstruction of the Larry Song discovery for which the [trial c]ourt sanctioned Goodsill.

(Some bracketed information in original.) Kamaka adds in her reply brief that:

While HRS § 607-14 provides different bases for calculating fees depending on whether plaintiff or defendant prevails, that provision does not apply where the jury finds for plaintiff but the trial court grants a [renewed motion for judgment as a matter of law] in *the same case*.

[Kamaka]'s [opening brief] argued that the retroactive application of *Gonsalves* to nullify [Kamaka]'s success at trial was impermissible because it was inequitable and unfair.

(Emphasis in original.)

First, with respect to Kamaka's assertion that this court should "disallow Goodsill's fees . . . which related to the obstruction of the Larry Song discovery for which the [trial c]ourt sanctioned Goodsill," this

court, subsequent to Kamaka's submission of her opening brief on appeal, vacated the trial court's orders granting sanctions against Goodsill. *See Kamaka v. Goodsill*, No. 24577, 108 Hawai'i 194, 118 P.3d 677, 2005 WL 2105595 (Haw. Aug.31, 2005) (mem.). Thus, Kamaka's argument based on those sanctions is moot. Second, assuming this court agrees with the discussion and recommendation to affirm the trial court's grant of Goodsill's renewed motion for judgment as a matter of law, Kamaka's argument that the trial court's reliance on *Gonsalves* was error is also moot. Third, Kamaka's reliance upon *MFD Partners* is misplaced. In *MFD Partners*, the jury found in favor of plaintiff on the issue of liability and awarded nominal damages; judgment was entered in favor of the plaintiff. 9 Haw.App. at 512, 850 P.2d at 715. Thereafter, the defendant sought an award of attorneys' fees, arguing that, because the jury awarded plaintiff only nominal damages, plaintiff was not the prevailing party. *Id.* The trial court denied the defendant's request for attorneys' fees and, on appeal, the Intermediate Court of Appeals (ICA) affirmed. *Id.* at 515, 850 P.2d at 716. In so doing, the ICA stated that,

> when a jury finds for the plaintiff as to liability, the plaintiff is the prevailing party and entitled to costs even though the jury determines that the plaintiff has suffered no more than nominal damages. 10 C. Wright, S. Miller & M. Kane, Federal Practice and Procedure: Civil at 186–87 § 2667 (2d ed.1983) (discussing Rule 54(d), Federal Rules of Civil Procedure, which is representative of the usual approach to allowing costs to the "prevailing party"). As stated in Moore's Federal Practice, "[i]n general, a party in whose favor judgment is rendered by the district court is the prevailing party in that court, plaintiff or defendant, as the case may be. Although a plaintiff may not sustain his entire claim, *if judgment is rendered for him[,] he is the prevailing party" for purposes of costs and attorneys' fees*, 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice at 54–323—54–324, ¶ 54.70[4] (2d ed.1992) (citations omitted).

9 Haw.App. at 514, 850 P.2d at 716 (some citations omitted) (emphasis added). Moreover, this court has previously stated that, for purposes of HRS § 607–14, the party in whose favor judgment was entered is the prevailing party. *Blair*, 96 Hawai'i at 330–31, 31 P.3d at 187–88. Inasmuch as the trial court entered final judgment in favor of Goodsill, Goodsill was the prevailing party for purposes of attorneys' fees and costs. Finally, as to Kamaka's assertion that Goodsill's abusive tactics calls for a balancing of the equities, the trial court, in its order denying Kamaka's motion for fees and costs, stated that "[e]ach of the actions taken by [Goodsill], when considered in isolation, does not amount to bad faith litigation tactics or that [Goodsill] acted for reasons of harassment, delay or other improper purpose." Having observed, first-hand, the conduct of the parties in this litigation that spanned several years, the trial court's assessment of the equities is the most credible and should not be disturbed, especially in light of this court's conclusion that Goodsill had not violated the circuit court's discovery orders and vacated the sanctions levied against Goodsill. *Cf. Stanford Carr Dev. Corp.*, 111 Hawai'i at 306, 141 P.3d at 479 (stating trial judge is expert himself or herself and knows as well as a legal expert what are reasonable attorneys' fees and may proceed upon its own knowledge of the value of the solicitor's services).

Based on the foregoing, we believe there is ample documentation in the record to explain and support the trial court's award of 364,-154.25 in attorneys' fees pursuant to HRS § 607–14. Accordingly, we hold that the trial court did not abuse its discretion in granting Goodsill's motion for attorneys' fees.

## IV. CONCLUSION

Based on the foregoing discussion, we affirm the trial court's final judgment, entered on December 24, 2003, in favor of Goodsill and against Kamaka on all claims and the order granting attorneys' fees and costs in favor of Goodsill and against Kamaka, filed on December 24, 2003. In light of the aforementioned disposition, Goodsill's cross-appeal need not be addressed.